## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RONALD ST. CYRE**                                    **CIVIL ACTION**

**VERSUS**                                                        **NO. 24-1281**

**MARCUS MYERS, WARDEN**                      **SECTION: "P"(3)**

### REPORT AND RECOMMENDATION

Ronald St. Cyre, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

St. Cyre was charged with possession of a firearm by a convicted felon.[1] On July 19, 2018, after a jury trial, he was convicted as charged.[2] On July 31, 2018, the trial court sentenced St. Cyre to a term of imprisonment of fifteen years at hard labor without the benefit of probation, parole, or suspension of sentence.[3] The state filed a multiple offender bill of information charging St. Cyre as a habitual felony offender with four prior convictions.[4] St. Cyre initially denied the allegations and filed a motion to quash the multiple bill.[5] On September 21, 2018, St. Cyre withdrew the motion to quash and, pursuant to a plea agreement with an agreed upon sentence of

---

[1] R. Doc. 16-1 at 43, Bill of Information, 2/5/18.
[2] R. Doc. 16-1 at 34–35, Trial Minutes, 7/19/18.
[3] R. Doc. 16-1 at 35, Sentencing Minutes, 7/31/18; R. Doc. 16-3 at 255–60, Sentencing Hearing Transcript, 7/31/18.
[4] R. Doc. 16-1 at 191–92, Multiple Offender Bill of Information R.S. 15:529.1, 8/1/18.
[5] R. Doc. 16-1 at 37, Hearing Minutes, 8/1/18; R. Doc. 16-3 at 261–66, Hearing Transcript, 8/1/18; R. Doc. 16-1 at 193–95, Response and Objections to Habitual Offender Bill of Information Pursuant to La. R.S. 15.299.1, 8/2/18; *id.* at 202–02, Motion to Quash the Habitual Offender Bill of Information, 8/2/18.

thirty years, admitted that he was a second felony offender.[6] The trial court adjudicated St. Cyre as a second felony offender, vacated his previous sentence, and sentenced him to thirty years at hard labor without the benefit of probation, parole, or suspension of sentence.[7]

St Cyre filed a direct appeal to the Louisiana First Circuit alleging the following claims: (1) the trial court erred in denying his motion to suppress the evidence from the vehicle; (2) the trial court erred in denying his motion to suppress his statement to Agent Everly; (3) the trial court erred in permitting the state to present prejudicial evidence without probative value after previously ruling the evidence was inadmissible; (4) the trial court erred in overruling his objection to the prosecutor's closing argument; (5) the evidence was insufficient to support his conviction for possession of a firearm by a convicted felon; (6) the trial court erred in imposing a sentence without the benefit of parole; and (7) his conviction should be reversed because he was denied his constitutional right to a complete record of the proceedings.[8] On December 19, 2019, the Louisiana First Circuit Court of Appeal affirmed St. Cyre's conviction, habitual offender adjudication, and sentence.[9] The

---

[6] R. Doc. 16-1 at 39–40, Multiple Offender Hearing and Sentencing Minutes, 9/21/18; R. Doc. 16-3 at 268–74, Multiple Offender Hearing and Sentencing Transcript, 9/21/18.

[7] *Id.*; R. Doc. 16-3 at 268–74, Multiple Offender Hearing and Sentencing Transcript, 9/21/18; R. Doc. 16-1 at 224, Reasons for Judgment on Multiple Offender Adjudication, 9/24/18.

[8] R. Doc. 16-4, at 33–67, Appeal Brief, 2019 KA 0034, 6/3/19; *id.* at 120-28, Reply Brief, 2019 KA 0034, 8/1/19.

[9] *State v. St. Cyre*, 292 So. 3d 88 (La. App. 1st Cir. 2019); R. Doc. 16-5 at 40–75.

Louisiana Supreme Court then denied St. Cyre's related writ application without commentary on May 26, 2020.[10]

On August 20, 2021, St. Cyre filed a counseled application for post-conviction relief claiming: (1) ineffective assistance of counsel in failing to investigate the case; (2) ineffective assistance of counsel in failing to object to the trial court's denial of his motion to suppress based on legal grounds that a parole officer is prohibited from searching property belonging to a third person; (3) ineffective assistance of counsel in failing to object under *State v. Johnson*, 389 So. 2d 371 (La. 1980), to the trial court's decision to allow the state to introduce character evidence to rebut Chelsea St. Cyre's testimony; (4) ineffective assistance of counsel in failing to object to jury instructions that differed from the proposed instructions; (5) ineffective assistance of counsel in failing to request a mistrial or continuance when certain evidence was introduced during the cross-examination of Agent Everly; (6) ineffective assistance of counsel in failing to include in his motion for new trial a claim related to the state's late disclosure of pertinent records; (7) ineffective assistance of trial and sentencing counsel in failing to investigate and present mitigation evidence during sentencing or the multiple bill negotiation process; (8) he was not tried by a jury of his peers; (9) ineffective assistance of counsel in failing to file a motion to quash the general and petite venire; (10) he did not knowingly and intelligently waive his statutory and constitutional rights when he admitted the state's allegations were true at his multiple bill hearing; and (11) prosecutorial misconduct.[11]

---

[10] *State v. St. Cyre*, 296 So. 3d 1063 (La. 2020); R. Doc. 16-5 at 1.
[11] R. Doc. 16-6 at 46–58, Application for Post Conviction Relief, 8/20/21.

St. Cyre filed a supplemental application for post-conviction relief on March 7, 2023 asserting the following claims: (1) ineffective assistance of counsel in failing to object to the admission of improper evidence; (2) ineffective assistance of counsel at sentencing; (3) his habitual offender plea was taken in violation of Louisiana law resulting in a violation of due process; (4) ineffective assistance of appellate counsel; (5) his right to due process of law was violated when the trial judge had an ex parte communication with the jury in the jury deliberation room; and (6) cumulative error.[12] St. Cyre filed supplemental exhibits in support of his amended petition on March 28, 2023, April 4, 2023, and May 19, 2023.[13] On June 27, 2023, the trial court denied relief.[14]

On November 20, 2023, the Louisiana First Circuit denied St. Cyre's related writ application.[15] On May 7, 2024, the Louisiana Supreme Court denied relief, finding that St. Cyre failed to show lower court error and failed to satisfy his post-conviction burden of proof under La. Code Crim P. art 930.2.[16]

## I.    FEDERAL PETITION

On May 16, 2024, St. Cyre, through counsel, filed a petition for habeas corpus.[17] On June 21, 2024, he filed an amended petition for habeas corpus in which

---

[12] R. Doc. 16-6 at 83-121, Supplemental Application for Post Conviction Relief, 3/7/23.
[13] R. Doc. 16-6 at 895-97, 899-904, Supplemental Exhibit to Application for Post-Conviction Relief, 3/28/23; *id.* at 907-909, 911-24, Supplemental Exhibit to Application for Post-Conviction Relief, 4/4/23; *id.* at 925-26, Supplemental Exhibit to Application for Post Conviction Relief, 5/19/23.
[14] R. Doc. 16-6 at 1140-1153, Order and Reasons, 6/27/23.
[15] *State v. St. Cyre*, No. 2023 KW 0950, 2023 WL 8016458 (La. App. 1st Cir. Nov. 20, 2023); R. Doc. 16-8 at 56.
[16] *State v. St. Cyre*, 384 So. 3d 342 (La. 2024); R. Doc. 16-6 at 1-2.
[17] R. Doc. 1.

he raises the following claims for relief:[18] (1) the trial court erred in denying his motion to suppress evidence because there was no reasonable suspicion to conduct a search and the vehicle belonged to a third party; (2) the trial court erred in denying his motion to suppress his statement to Agent Everly because he was not properly *Mirandized* before his custodial interrogation; (3) ineffective assistance of counsel in failing to object to improper use of evidence at trial; (4) ineffective assistance of counsel at sentencing and on appeal; (5a) his habitual offender plea was taken in violation of Louisiana law and violated due process; (5b) the trial judge had an ex parte communication with the jury in violation of his right to due process; and (6) cumulative error requires reversal of his conviction.

The state initially claimed that St. Cyre's petition was untimely.[19] The Court noted errors in the state's calculation and ordered the state to file a supplemental response.[20] In its supplemental response, the state concedes that St. Cyre's petition is timely and that his claims are exhausted.[21] The state asserts that St. Cyre's claims are meritless.[22] St. Cyre filed a reply memorandum.[23]

## II.    GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, applies to St. Cyre's petition filed in this Court on

---

[18] R. Doc. 11.
[19] R. Doc. 17.
[20] R. Doc. 21.
[21] R. Doc. 25 at 4.
[22] *Id.* at 5–16.
[23] R. Doc. 33.

May 16, 2024. The threshold questions on habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. *Nobles v. Johnson*, 127 F.3d 409, 419–20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)). As indicated, the state concedes that St. Cyre's petition was timely filed and that the claims are exhausted.

III.  **FACTS**

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> In January 2018, the defendant was on parole for having previously committed the crime of possession of a firearm by a convicted felon. Agent Steve Everly, with the Department of Public Safety and Corrections, Division of Probation and Parole, supervised the defendant's felony parole. On January 9, 2018, the defendant's wife, Chelsea, drove him to the office of Agent Everly on Columbia Street in Covington, Louisiana, in order to fill out paperwork to facilitate a relocation to Georgia to live with a relative. Chelsea drove the defendant's aunt's Honda Accord because his truck was in the shop being repaired. When the defendant arrived at Agent Everly's office, he was on crutches because he suffered a gunshot wound to the leg. The defendant told Agent Everly that his wife had driven him to the office.
> In order to process the paperwork for the defendant's transfer to Georgia, the defendant was required to pay a fee. Therefore, the defendant left the parole office and went to the post office to obtain a $150.00 money order for the transfer fee. While the defendant was gone, Agent Everly obtained approval from his supervisor, Agent Lindy Lousteau, with the Department of Public Safety and Corrections, Division of Probation and Parole, to search the vehicle in which the defendant had arrived (the Accord). When the defendant returned from the post office, Agent Everly told him he was going to search the vehicle. Agent Everly asked the defendant if there was anything in the vehicle that he should not have, and the defendant replied that there was not. The defendant then began texting on his phone. When Agent Everly

observed the defendant texting, he took the defendant's phone. When Agent Everly looked at the phone screen, he saw that the defendant sent a text to Chelsea which said, "Get that gun from underwear rite [sic]," and that Chelsea responded, "Put it wear [sic]."

After reading the text messages, Agent Everly brought the defendant to Supervisor Lousteau's office. Agent Everly then enlisted the help of two other agents, including Agent Christopher Howell, with the Department of Public Safety and Corrections, Division of Probation and Parole. The three agents went to the parking lot to search the vehicle. While they were in the parking lot, Chelsea called the defendant's phone, which was still in the possession of Agent Everly. Agent Everly answered the phone and asked Chelsea where she was located. Chelsea then directed the agents to her location. The agents approached the Accord, Agent Everly asked Chelsea where the gun was, and she told him that it was underneath the driver's seat. Agent Howell removed the gun from the car, a .40 caliber Glock handgun, and gave it to Agent Everly.

Agent Everly returned to Supervisor Lousteau's office. He **Mirandized** the defendant and asked him about the gun. The defendant told him that his aunt bought the gun and gave it to him "for safety, because he was in fear of his life." The defendant was subsequently arrested.

Chelsea testified at trial that the defendant did not know about the gun in the vehicle until they had arrived at the post office, and Chelsea had told him that she inadvertently discovered the gun under the seat. Priscilla Vaughn, the defendant's aunt whose Accord the defendant had borrowed, testified at trial that she bought the dock gun and kept it in her vehicle for her protection when going to work. She indicated that she did not give the gun to the defendant.

The defendant did not testify at trial.[24]

## IV.  STANDARDS OF A MERITS REVIEW

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by AEDPA, provides the

applicable standards of review for pure questions of fact, pure questions of law, and

mixed questions of both. A state court's purely factual determinations are presumed

---

[24] *St. Cyre*, 292 So. 3d at 95–96; R. Doc. 16-5 at 41–43.

to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of Section 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or confronts a set of facts that are materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010). An "unreasonable application" of [Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule ... but unreasonably applies it to the facts

of the particular state prisoner's case." *Williams*, 529 U.S. at 407–08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent does not warrant habeas relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under AEDPA. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Section 2254(d) preserves authority to issue the writ in cases where there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*; *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

AEDPA's deferential standard of review under Section 2254(d) and *Williams*, 529 U.S. at 362, applies only to claims adjudicated on the merits by the state courts. 28 U.S.C. § 2254(d). With respect to claims that were not fully adjudicated on the merits in state court, the deferential AEDPA standards of review do not apply. *Cullen v. Pinholster*, 563 U.S. 170, 185-86 (2011); *Henderson v. Cockrell*, 333 F.3d 592, 597 (5th Cir. 2003). Instead, the federal courts review those claims under pre-AEDPA *de novo* standards of review. *Id.* at 598 (citing *Jones v. Jones*, 163 F.3d 285, 299–300

(5th Cir. 1998) (applying *de novo* standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits)); *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009).

## V.    ST. CYRE'S CLAIMS[25]

### A. Denial of Motion to Suppress Evidence (Claim One)

St. Cyre's first claim is that the trial court erred in denying his motion to suppress evidence found in the vehicle. St. Cyre claims that the search of the vehicle occurred without reasonable suspicion. He further claims that no valid consent was given to search the vehicle, which belonged to a third party.

The state asserts that St. Cyre was provided with an opportunity for full and fair litigation of his Fourth Amendment claim and, as a result, his claim is barred by *Stone v. Powell*, 428 U.S. 465 (1976). St. Cyre responds that the claim was not fully and fairly litigated because the state trial court did not properly consider the factual disputes in the record.

St. Cyre's trial counsel filed a motion to suppress the evidence. The trial court held a hearing on July 11, 2018.[26] After considering the testimony presented and the arguments of the defense, the trial court denied the motion to suppress evidence.[27]

In rejecting the suppression claim on his direct appeal, the Louisiana First Circuit Court of Appeal found as follows:

---

[25] For ease of analysis, some of St. Cyre's claims are discussed in a different order than listed in the amended petition.

[26] R. Doc. 16-1 at 25–26, Hearing Minutes, 7/11/18; R. Doc. 16-2 at 2–63, Hearing Transcript, 7/11/18.

[27] *Id.* at 26; R. Doc. 16-2 at 58, Hearing Transcript, 7/11/18.

In his first assignment of error, the defendant argues that the trial court erred in denying his motion to suppress the evidence. Specifically, the defendant contends that there was no reasonable suspicion to search the vehicle; that the search was not of the defendant's vehicle; and that no consent was given to search the vehicle.

Trial courts are vested with great discretion when ruling on a motion to suppress. **State v. Long**, 2003-2592 (La. 9/9/04), 884 So.2d 1176, 1179, cert. denied, 544 U.S. 977, 125 S.Ct. 1860, 161 L.Ed.2d 728 (2005). When a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion, i.e., unless such ruling is not supported by the evidence. See **State v. Green**, 94-0887 (La. 5/22/95), 655 So.2d 272, 280-81. However, a trial court's legal findings are subject to a *de novo* standard of review. See **State v. Hunt**, 2009-1589 (La. 12/1/09), 25 So.3d 746, 751. In determining whether the ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. **State v. Brooks**, 92-3331 (La. 1/17/95), 648 So.2d 366, 372.

At the motion to suppress hearing, Agent Everly established the following. The defendant arrived at his office on crutches. The defendant, who had been shot two months before, explained to Agent Everly that his wife, Chelsea, drove him to the office. Agent Everly ran a drug screen on the defendant, who tested positive for marijuana, benzodiazepine, and oxycodone. The defendant told Agent Everly that he had prescriptions for the benzodiazepine and oxycodone, but did not have those prescriptions with him. Agent Everly and the defendant filled out paperwork that would enable the defendant to transfer to a different jurisdiction, namely Atlanta, Georgia. Agent Everly then texted Supervisor Lousteau to see if he should search the vehicle in which the defendant had arrived Supervisor Lousteau approved the search of the vehicle. As Agent Everly walked out of his office to go to the vehicle, he noticed that the defendant stayed behind and was texting on his phone. Agent Everly took the defendant's phone and saw the following text: "Get that gun from underwear rite [sic]." The reply to this was, "Put it wear [sic]." With his own phone, Agent Everly took a screen shot of this text.

Agent Everly enlisted the help of two other agents to conduct the search. The agents went outside to find the vehicle in which defendant arrived. Agent Everly still had the defendant's phone. Chelsea called the defendant's phone, and Agent Everly answered the phone and asked

Chelsea where she was located. Chelsea signaled her position, and the agents went to the vehicle. Agent Everly directed Chelsea to tell him where the gun was located. Chelsea told Agent Everly that the gun was under the driver's seat. Agent Howell removed the gun and gave it to Agent Everly, who unloaded the gun before going back inside. According to Agent Everly, the handgun was a .40 caliber Glock, fully loaded; that is, it had a full magazine with a round in the "pipe."

The defendant argues in brief that there was no reasonable suspicion to search the vehicle. According to the defendant, evidence of his gunshot wound and positive drug screen had no connection to the vehicle. Further, the defendant avers that there was no reasonable suspicion that evidence would be found in the vehicle because of the length of time that had passed. Specifically, the defendant pointed out that it had been 65 days since the gunshot wound occurred, and that marijuana can stay in your system for up to ten days after consumption.

The Fourth Amendment to the United States Constitution and Article I, § 5, of the Louisiana Constitution protect people against unreasonable searches and seizures. Subject only to a few well-established exceptions, a search or seizure conducted without a warrant issued upon probable cause is constitutionally prohibited. Once a defendant makes an initial showing that a warrantless search or seizure occurred, the burden of proof shifts to the State to affirmatively show it was justified under one of the narrow exceptions to the rule requiring a search warrant. **State v. Lowery**, 2004-0802 (La. App. 1st Cir. 12/17/04), 890 So.2d 711, 717, writ denied, 2005-0447 (La. 5/13/05), 902 So.2d 1018. See La. Code Crim. P. art. 703(D); **State v. Hood**, 2012-0006 (La. App. 1st Cir. 6/8/12), 2012 WL 2061512 at *2 (unpublished), writ denied, 2012-1579 (La. 1/25/13), 105 So.3d 64.

A parolee has a reduced expectation of privacy, subjecting him to reasonable warrantless searches of his person and residence by his parole officer. See **State v. Malone**, 403 So.2d 1234, 1238 (La. 1981); **State v. Hamilton**, 2002-1344 (La. App. 1st Cir. 2/14/03), 845 So.2d 383, 387, writ denied, 2003-1095 (La. 4/30/04), 872 So.2d 480. The reduced expectation of privacy is a result of the parolee's conviction and agreement to report to a parole officer and to allow that officer to investigate his activities in order to confirm compliance with the provisions of his parole. **Hamilton**, 845 So.2d at 387. A parole officer's powers, however, are not without some restraints. A parole officer may not use his authority as a subterfuge to help another police agency that desires to conduct a search, but lacks the necessary probable cause. The parole officer must believe that the search is necessary in the

performance of his duties and reasonable in light of the total circumstances. **Id.**

It is an appropriate function of a parole officer to conduct unannounced, random checks on parolees. A parolee agrees to submit to such unannounced visits from his parole officer as a condition of parole. **Hamilton**, 845 So.2d at 387. A probationer has essentially the same status as a parolee. **Malone**, 403 So.2d at 1238; **Hood**, 2012 WL 2061512 at *2. A probation officer's decision to search must be supported by something more than a mere hunch; however, a reasonable suspicion that criminal activity is occurring will suffice. The officer is not required to have probable cause to conduct the search. To require otherwise would place unnecessary obstacles in the path of a probation officer who is performing his job of supervising the individual assigned to him. **Malone**, 403 So.2d at 1239.

In this matter, the defendant, a parolee, had just recently been involved in a shooting, he was on parole for a previous conviction of La. R.S. 14:95.1 (possession of a firearm by a convicted felon), and he had just tested positive for having marijuana in his system. Agent Everly noted as much at the motion to suppress hearing when he explained that he had texted his supervisor about searching the vehicle because the defendant "was involved in a shooting, and he tested positive for marijuana."

In fact, the defendant's positive drug screen for marijuana, alone, provided Agent Everly with reasonable suspicion that the defendant, a parolee, had committed a crime. Whatever other subjective motivations Agent Everly may have had to search the vehicle, such as the text message, were of no consequence. The fact that the officer does not have the state of mind that is hypothecated by the reasons that provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action. **Whren v. United States**, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996). Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis. **Id.**

The defendant suggests in brief that a "positive drug screen does not give rise to reasonable suspicion that criminal activity **is occurring**," particularly for marijuana since, according to the defendant, a casual user of marijuana may test positive for marijuana "up to 10 days after consumption." (Emphasis in original). Whether the defendant smoked marijuana just prior to entering Agent Everly's office or hours before is of no moment. That the defendant possessed marijuana at some point in

the recent past was enough to establish that a crime *had been committed* while the defendant was on parole, rather than was *occurring* at that moment, as suggested by the defendant. When the defendant was released on parole in December of 2015, he signed a Department of Public Safety and Corrections Diminution of Sentence form, which provided a list of conditions under which parole was granted. The ninth condition in this list provides: "I agree to visits at my residence or place of employment by my Parole Officer at any time. I also agree to searches of my person, property, residence, and/or vehicle, when reasonable suspicion exists that I am or have been engaged in criminal activity." See La. R.S. 15:574.4.2(A)(2)(i).[2]

> [2]Under this statutory provision, the committee on parole may require the parolee to conform to conditions of parole, including to agree to searches of person, property, residence, or vehicle, when reasonable suspicion exists that criminal activity has been engaged in while on parole.

In the similar case of **State v. Thomas**, 96-2006 (La. App. 4th Cir. 11/6/96), 683 So.2d 885, defendant, a probationer, met her probation and parole officer, Agent Morantine at her office. A routine urine test was conducted, and defendant tested positive for cocaine. While Agent Morantine waited for the police to come and arrest defendant, two other probation officers searched the vehicle defendant had driven to the office. The officers seized defendant's purse from the vehicle, emptied it, and discovered a matchbox that held a glass container with burnt residue on it. Defendant was arrested for possession of drug paraphernalia. **Id.** at 886. The fourth circuit found that a search of defendant's vehicle and belongings after she tested positive for drugs, done in accordance with the usual practice of the probation office, was entirely reasonable and did not require a warrant. **Id.** at 888.

The defendant in brief cites to **State v. Clay**, 2017-424 (La. App. 5th Cir. 5/23/18), 248 So.3d 665, 667-69, wherein defendant, a parolee, was subjected to a warrantless search of his residence and vehicle, referred to by the State as a compliance check. The search of defendant's vehicle resulted in the seizure of a handgun. At the hearing on the motion to suppress the evidence, it was learned that Gretna Police Department Detective Alfred Disler (who was handling defendant's case) was contacted by Jefferson Parish Sheriff's Office Agent Pat DiGiovanni, who stated he had spoken to an informant who told him that a suspect in an "unrelated investigation," identified as defendant, was involved in an armed robbery in Lafourche Parish. Detective Disler also learned from Agent DiGiovanni that the informant had advised him that defendant was selling guns from a residence located behind a Circle K convenience store. They conducted a computer search and learned that

defendant was on parole for a previous 2004 armed robbery conviction. At that point, Detective Disler contacted Agent Justin Edgecombe of the Louisiana Department of Probation and Parole to advise him of the investigation involving defendant. Agent Edgecombe confirmed to Detective Disler that defendant was on parole and provided him with the address defendant had listed with Probation and Parole. According to Detective Disler, he also contacted other members of the Gretna Police Department to assist in the anticipated compliance check of defendant's residence, where officers found marijuana, a pipe, a drug test kit, and a scale. The trial court denied the motion to suppress.

The fifth circuit reversed the trial court's ruling, finding that defendant's parole officer used his authority as a subterfuge to help another police agency that desired to conduct a search, but lacked the necessary probable cause. **Clay**, 248 So.3d at 679. The fifth circuit found there was no justification for any search because there was no reasonable suspicion of any criminal activity by defendant. The fifth circuit stated: "In short, reviewing the totality of the circumstances, we find a complete lack of evidence to prove that Probation and Parole had reasonable suspicion that criminal activity was occurring prior to participating in the compliance check and subsequent warrantless search of defendant's residence and vehicle." **Id.** at 680.

The defendant's reliance on **Clay** is misplaced. In the instant matter, the positive drug screen test revealed to Agent Everly that the defendant had committed a crime, namely possession of marijuana, and was therefore in violation of his parole at that moment, even before the vehicle was searched. In **Clay**, the State failed to show that any of the officers involved in the search of defendant's residence and vehicle had any reasonable suspicion whatsoever (much less probable cause) that defendant had committed any crime. As the fifth circuit in **Clay** pointed out, "[t]here is a complete lack of evidence in the record establishing that the agents from Probation and Parole possessed sufficient—or any— reasonable suspicion that criminal activity was occurring that would justify their warrantless search of defendant's residence and vehicle." **Clay**, 248 So.3d at 683.

The defendant further argues in brief that the search of his cell phone did not cure the lack of reasonable suspicion. The defendant notes that the warrantless search of a cell phone is unconstitutional even when incident to a lawful arrest. See **Riley v. California**, 573 U.S. 373, 386, 134 S.Ct. 2473, 2485, 189 L.Ed.2d 430 (2014) (holding that officers must generally secure a warrant before conducting a search of data on cell phones).

As discussed above, Agent Everly had reasonable suspicion that the defendant had committed a crime (possession of marijuana) before he took the defendant's phone. That is, notwithstanding any text that may or may not have been observed, Agent Everly, based on reasonable suspicion of a crime, was heading to the vehicle in which defendant had arrived. Moreover, it is not clear that Agent Everly searched the defendant's phone for Fourth Amendment purposes. Agent Everly explained that when he saw the defendant texting in his office, he told the defendant he was not allowed to text and took the phone. When Agent Everly looked at the phone screen, he saw the text from the defendant stating "Get that gun" and the reply text of "Put it wear [sic]."

An exception to the search warrant requirement is the plain-view exception. Two conditions must be satisfied to trigger the applicability of the doctrine: (1) there must be a prior justification for an intrusion into the protected area; (2) it must be immediately apparent without close inspection that the item is evidence or contraband. See **Horton v. California**, 496 U.S. 128, 135-137, 110 S.Ct. 2301, 2307, 110 L.Ed.2d 112 (1990); **State v. Howard**, 2001-1487 (La. App. 1st Cir. 3/28/02), 814 So.2d 47, 53, writ denied, 2002-1485 (La. 5/16/03), 843 So.2d 1120. While the text itself was not contraband, it was evidence that there was likely contraband in the car the defendant was in. Accordingly, the viewing of the text on the cell phone arguably fell under the plain view exception to the warrant requirement. In any event, as noted, Agent Everly was going to search the vehicle, regardless of the discovery of any text messages; as such, the gun inevitably would have been found. See **Nix v. Williams**, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984).

Finally, the defendant argues in brief that no consent was given to search the vehicle, and Agent Everly should not have had the right to search a third-party vehicle that did not belong to the defendant. Regarding consent, Agent Everly was not required to obtain consent from either the defendant or Chelsea to search the vehicle. By virtue of the Diminution of Sentence form the defendant signed as a parolee, he gave his consent to search the moment there was reasonable suspicion that he was engaging or had been engaging in criminal activity. Moreover, when Agent Everly learned that there was a gun in the vehicle, exigent circumstances gave him the right to search without a warrant or consent. See **State v. Brumfield**, 2005-2500 (La. App. 1st Cir. 9/20/06), 944 So.2d 588, 595-98, writ denied, 2007-0213 (La. 9/28/07), 964 So.2d 353.

16

Additionally, the defendant's argument that Agent Everly could not search the vehicle (without consent) because it was not owned by the defendant is baseless. The vehicle searched was the vehicle that the defendant rode in to get to Agent Everly's office.

In **Pennsylvania v. Labron**, 518 U.S. 938, 940, 116 S.Ct. 2485, 2487, 135 L.Ed.2d 1031 (1996) (per curiam), the United States Supreme Court held that if a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits the police to search the vehicle without more. When Agent Everly learned there was a gun in the vehicle and that the defendant's wife was still in the vehicle, he had the right to search that vehicle because he had probable cause to believe the vehicle contained contraband or evidence of a crime. Ownership of the vehicle was irrelevant. See **State v. Williams**, 38,379 (La. App. 2nd Cir. 11/25/03), 858 So.2d 878, 880-81, underline writ denied, 2003-3535 (La. 3/12/04), 869 So.2d 807 (finding that the facts known to the arresting police officer gave probable cause to search and seize contraband from the vehicle, where the non-owner passenger of the car gave consent after the non-owner driver refused consent). This is the same principle that allows the police, who have probable cause to search an entire vehicle, to also open any container inside the vehicle, without regard to who might own each container. See **United States v. Ross**, 456 U.S. 798, 825, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982); **State v. Jackson**, 2009-1983 (La. 7/6/10), 42 So.3d 368, 374 (per curiam).

Based on all of the foregoing, Agent Everly had reasonable suspicion, as well as probable cause, to search the vehicle and seize the gun that was in it. The trial court did not err or abuse its discretion in denying the motion to suppress the evidence.

Accordingly, this assignment of error is without merit.[28]

The Louisiana Supreme Court then denied St. Cyre's related writ application as to this issue without assigning additional reasons.[29]

To the extent that St. Cyre argues that the state courts misapplied state evidence law in finding the evidence admissible, his claim is not reviewable in this

---

[28] *St. Cyre*, 292 So. 3d at 96–101; R. Doc. 16-5 at 43–52.
[29] *St. Cyre*, 296 So. 3d at 1063; R. Doc. 16-5 at 1.

federal proceeding. As the United States Fifth Circuit Court of Appeals has held: "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998). To the extent that St. Cyre argues that the search violated federal law, his claim fares no better because this Court is barred from reviewing any such Fourth Amendment claim by *Stone*.

In *Stone*, the United States Supreme Court held that where a state provides an opportunity for full and fair litigation of Fourth Amendment claims in the state courts, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence against him was obtained in an unconstitutional search and seizure. 428 U.S. at 494 (footnote omitted); *see also Janecka v. Cockrell*, 301 F.3d 316, 320 (5th Cir. 2002). Interpreting *Stone*, the Fifth Circuit has held:

> An "opportunity for full and fair litigation" means just that: an opportunity. If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, *Stone v. Powell* bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes.

*Caver v. Alabama*, 577 F.2d 1188, 1192 (5th Cir. 1978). Therefore, the *Stone* bar applies even in those cases where no motion to suppress was ever filed. *Id.* at 1192–93. The *Stone* bar further applies even if the state court rulings on the Fourth Amendment claims were erroneous. *Swicegood v. Alabama*, 577 F.2d 1322, 1324 (5th Cir. 1978).

*Stone* clearly applies here. As an initial matter, the Court notes that "[i]t is beyond cavil that Louisiana courts provide criminal defendants the opportunity to

raise Fourth Amendment claims." *Bailey v. Cain*, Civ. Action No. 06-839, 2007 WL 1198911, at *13 (E.D. La. Apr. 20, 2007). Moreover, St. Cyre availed himself of that opportunity. The state court record shows that defense counsel filed a motion to suppress, St. Cyre's Fourth Amendment claims were fully litigated and denied after a hearing, and the claim was asserted, considered, and again denied on direct review. Because St. Cyre was afforded a full and fair opportunity to litigate his Fourth Amendment claim in state courts, *Stone* bars this Court from considering that claim. *Cardwell v. Taylor*, 461 U.S. 571 (1983); *Jones v. Johnson*, 171 F.3d 270, 278 (5th Cir. 1999); *Davis v. Cain*, Civ. Action No. 07-6389, 2008 WL 5191912, at *18 (E.D. La. Dec. 11, 2008).

For these reasons, St. Cyre has not established that his claim is cognizable on federal habeas corpus review or that the state court's decision rejecting his claim was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. Accordingly, Claim One should be denied.

### B. Motion to Suppress Statement (Claim Two)

St. Cyre next claims that the trial court erred in denying his motion to suppress his statement to Agent Everly. St. Cyre asserts that he was not properly *Mirandized* as the questioning commenced prior to reading St. Cyre his *Miranda* rights. In support of this claim, St. Cyre argues that Agent Everly's testimony at the suppression hearing was not credible.

The state responds that the state courts correctly applied the applicable law. The state asserts that, to the extent that St. Cyre argues that the state courts erroneously evaluated Agent Everly's credibility, he fails to rebut the presumption of

correctness of the state court's factual determination that he was advised of his rights prior to making an inculpatory statement. St. Cyre replies that the state court's adjudication of his claim was based on an unreasonable determination of the facts and that the state appellate court unreasonably applied clearly established law.

Defense counsel filed a motion to suppress the statement prior to trial.[30] The trial court held a hearing on July 11, 2018, after which it denied the motion to suppress the statement.[31] St. Cyre raised the issue on direct appeal. The Louisiana First Circuit Court of Appeal denied relief, finding as follows:

> In his second assignment of error, the defendant argues the trial court erred in denying his motion to suppress his statement to Agent Everly. Specifically, the defendant contends that he was not properly **Mirandized** before being questioned by Agent Everly.
>
> It is well-settled the ruling in **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) protects an individual's Fifth Amendment privilege during incommunicado interrogation in a police-controlled atmosphere. In **Miranda**, 384 U.S. at 444, 86 S.Ct. at 1612, the Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Thus, before a confession or inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his **Miranda** rights, that he voluntarily and intelligently waived those rights, and that the statement was made freely and voluntarily and not under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. Code Crim. P. art. 703(D); La. R.S. 15:451. **Hunt**, 25 So.3d at 754. See **State v. Patterson**, 572 So.2d 1144, 1150 (La. App. 1st Cir. 1990), writ denied, 577 So.2d 11 (La. 1991). Whether or not a showing of voluntariness has been made is analyzed on a case-by-case basis with regard to the facts and circumstances of each case. The trial court must consider the totality of the circumstances

---

[30] R. Doc. 16-1 at 48–49, Motion to Suppress Statements, 2/28/18.
[31] R. Doc. 16-1 at 25-26, Hearing Minutes, 7/11/18; R. Doc. 16-2 at 2–63, Hearing Transcript, 7/11/18.

in deciding whether a confession is admissible. **State v. Williams**, 2001-0944 (La. App. 1st Cir. 12/28/01), 804 So.2d 932, 944, <u>writ denied</u>, 2002-0399 (La. 2/14/03), 836 So.2d 135.

Although the burden of proof is generally on the defendant to prove the grounds recited in a motion to suppress evidence, such is not the case with the motion to suppress a confession. In a motion to suppress a purported confession, the burden of proof is with the State to prove the confession's admissibility. La. Code Crim. P. art. 703(D). Since the general admissibility of a confession (or inculpatory statement) is a question for the trial court, its conclusions on the credibility and weight of the testimony are accorded great weight and will not be overturned unless they are not supported by the evidence. **Patterson**, 572 So.2d at 1150. In determining whether the ruling on the defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. **Brooks**, 648 So.2d at 372.

The defendant argues that Agent Everly "started questioning" him before advising him of his **Miranda** rights. Further, according to the defendant, Agent Everly was not credible because, while he indicated that a short time elapsed between the commencement of questioning and the reading of his rights, the only documentary evidence shows that he was arrested at 2:00 p.m. and advised of his rights at 2:00 p.m. The defendant avers that this means that he waived his rights "at precisely the same time as his arrest." The defendant notes that Agent Everly testified that the defendant finished giving his statement before he was arrested. According to the defendant, even if he was properly advised of his rights at some point during his inculpatory statement, the State did not prove which portions of his inculpatory statement occurred before being advised of his rights and which portions occurred after being advised of his rights.

We address first the defendant's assertion that Agent Everly "started questioning" him before being **Mirandized**. After securing the gun, Agent Everly returned to Supervisor Lousteau's office, where the defendant was located. At the motion to suppress hearing, Agent Everly testified that as he "started speaking with the defendant," another agent passed the office and asked if Agent Everly had read him his rights. At that point, Agent Everly **Mirandized** the defendant. Agent Everly then testified at the suppression hearing: "I read him his rights. He stated that his aunt had bought the gun and given it to him for protection. He was very, I would say, contrite." Despite the defendant's contention,

there was nothing in this testimony that indicated the defendant confessed before being **Mirandized**.

At trial, Agent Everly testified that when he got back to Supervisor Lousteau's office, he informed her about what he and the other agents had found. He then advised the defendant of his **Miranda** rights via a card that he kept in his wallet. Agent Everly further testified that the defendant stated that he understood his rights, and that he agreed to waive those rights and speak to him. When asked what the defendant said, Agent Everly testified: "He was very contrite knowing that we found a gun. He said he didn't want to go to jail, that his aunt had bought the gun and given it to him for security, for safety, because he was in fear of his life." Agent Everly further indicated that he did not record the defendant's statement, and that he thought Agent Howell heard the defendant's inculpatory statement because Agent Howell was standing close by Supervisor Lousteau's office door.

Agent Howell testified at trial that he was actually in Supervisor Lousteau's office when he heard the defendant say that his aunt had given him the firearm for protection. Supervisor Lousteau testified at trial that Agent Everly had the defendant sit in her office while the vehicle was searched. According to Supervisor Lousteau, when Agent Everly returned to her office, he produced the handgun found in the vehicle. Supervisor Lousteau indicated that at this point, Agent Everly "read him his **Miranda** rights and questioned him about the weapon, about the firearm that he found." When Supervisor Lousteau was asked on direct examination about what she heard, the following exchange took place:

> A. I remember hearing him acknowledge his rights, and he admitted that the gun was out there and that there was attempts to hide it, but at that point, he was willing to come clean. And he was actually very, you know, sincere and stayed calm, but he admitted what he did wrong, and he admitted that he knew it was there and that he had — it wasn't his.

> He did not buy it, but it was given to him.

> Q. Did you learn who it was given to him by?

> A. He said it was his aunt, but I don't recall her name.

> Q. During that interaction, was your office door open or closed?

A. Open. It stays open.

Q. Tell me about the environment in the office. Was anybody screaming and shouting?

A. No, ma'am.

Q. Did anybody threaten or coerce the suspect into saying anything?

A. No, ma'am.

Regarding the defendant's contention that Agent Everly lacked credibility because the advisement of rights and arrest were documented as having occurred at the same time, we note the following exchange with Agent Everly on cross-examination:

Q. Now, are you as sure as you are about the rest of your testimony that you read Ronald St. Cyre his rights prior to him making a statement?

A. Yes.

Q. And, in fact, that you've read him the rights that were on the **Miranda** form, correct?

A. I read him both of them, yes. I read them off the card, and I read them again at the jail when I went and booked him.

Q. I'm going show you State's Exhibit 8. Can you tell me under the line that says "agent informing" -- what does it say? Agent informing what?

A. Prisoner signature, witness. There's my signature right there.

Q. Agent informing prisoner?

A. Yes.

Q. Whose signature is on that line?

A. No one.

Q. No one? How could no one's signature be on that line?

A. I signed the witness, where I witnessed it.

Q. Is that a mistake?

A. Probably. I was trying to get his arrest report done.

Q. Are you sure you read him his rights that day?

A. Yeah, I witnessed it right there. He signed it. He signed the document, and I witnessed him signing the document.

Q. Were you a witness to the person advising him of his rights, or did you advise him of his rights?

A. I advised him of his rights.

Q. That's you're [sic] testimony?

A. That's my testimony.

Q. That's not what his document says. His document just says you were a witness.

A. Okay. My testimony is I read him his rights, and I witnessed his signing it. I think I may have signed the wrong block, but I witnessed him sign that, yes.

Q. Then it's just another mistake?

A. No.

Q. Who are the other witnesses?

A. Lindy Lousteau.

Q. That's your supervisor, correct?

A. Yes.

Q. So Ms. Lousteau went to the jail with you then, right?

A. No.

Q. Well, didn't you testify that that's where you got this signed?

A. I got this signed at the jail, yes, but she witnessed.

Q. Ms. Lousteau didn't go with you?

A. No. She witnessed me give him the **Miranda** rights in her office. She witnessed that that is a true thing right there.

Q. So she didn't witness Ronald St. Cyre sign this form?

A. No.

Q. You just got the form witnessed later, right?

A. No. He was read his **Miranda** rights twice. She signed that he was read his rights.

Q. Can you go to your arrest report, D 1?

A. Yes.

Q. What's the time of arrest that you noted on your arrest report?

A. About 2:00 o'clock.

Q. Was it about 2, or does it say 2:00 p.m.?

A. 2:00 p.m.

Q. What's the time on State's Exhibit 8 that you said you read him his rights?

A. 2:00 p.m.

Q. 2:00 p.m., okay. We just went through the timeline, Agent. You read him his rights. That's what you testified to, right?

A. Yes.

Q. You questioned him for you don't know how long, and then you arrested him?

A. Yes.

Q. So why does the rights form say you've read him his rights at 2, and your arrest report says you arrested him at 2? How do you do it all at the same time?

A. It's the same form. It's the same thing. He was read his **Miranda** rights, and that's when I signed. I read them twice, but he signed at 2:00 o'clock, 2:00 o'clock is the same timeframe.

Q. So he waived his rights at the same time he was arrested?

A. Yes.

Q. Same exact time simultaneously?

A. Yes.

Q. When did he make a statement then?

A. After I arrested him. After I read him his **Miranda** rights.

Q. You just testified, we just went through it. **Miranda** rights, statement, arrest.

A. Yes.

Q. They can't be all done at the same time?

A. It was all at the same time. It's the same time.

Q. It was all at 2:00 p.m.? It all happened 2:00 p.m.? It didn't even take a second? Is that what you're testifying to?

A. No. The arrest time was 2:00 o'clock.

Q. As well as the time you read him his rights?

A. It's all the same timeframe.

Considering the great weight accorded a trial court's conclusions regarding credibility, we find no reason to disturb the trial court's ruling in denying the motion to suppress the defendant's inculpatory statement. Testimony of the interviewing police officer alone may be sufficient to prove a defendant's statements were freely and voluntarily

given. **State v. Maten**, 2004-1718 (La. App. 1st Cir. 3/24/05), 899 So.2d 711, 721, <u>writ denied</u>, 2005-1570 (La. 1/27/06), 922 So.2d 544. Agent Everly testified that he **Mirandized** the defendant, then got his statement, and then arrested him. Whether all this happened around 2:00 p.m. or in quick succession is of no moment. This was a credibility issue, and the trial court chose to believe the testimony of Agent Everly. Further, Supervisor Lousteau also testified she heard Agent Everly **Mirandize** the defendant, then question him about the gun.

Based on the foregoing, we find no error in the trial court's conclusion that the defendant was **Mirandized** before making the inculpatory statement. Further, the statement was freely and voluntarily given. Accordingly, the trial court did not err or abuse its discretion in denying the motion to suppress the statement.

This assignment of error is without merit.[32]

The Louisiana Supreme Court then denied St. Cyre's related writ application as to this issue without assigning additional reasons.[33]

The admissibility of a confession is a mixed question of law and fact. *Miller v. Fenton*, 474 U.S. 104, 112 (1985); *ShisInday v. Quarterman*, 511 F.3d 514, 522 (5th Cir. 2007) (citing *Miller*, 474 U.S. at 112). A federal court on habeas review must respect the state court's determination of voluntariness as long as it was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); *Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998). In doing so, a federal habeas court must afford a presumption of correctness to state courts' findings of fact if they are fairly supported by the record. *Miller*, 474 U.S. at 117. Similarly, the habeas standards of review oblige federal judges to respect credibility determinations made by the state court trier of

---

[32] *St. Cyre*, 292 So. 3d at 101–05; R. Doc. 16-5 at 52–57.
[33] *St. Cyre*, 296 So. 3d at 1063; R. Doc. 16-5 at 1.

fact. *Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir.1993) (citing *Sumner v. Mata*, 455 U.S. 591, 597 (1982)); *Self v. Collins*, 973 F.2d 1198, 1204 (5th Cir. 1992).

A statement made by a person in custody is inadmissible at trial unless the person was informed that he has the right to have an attorney present during questioning, that he has the right to remain silent, and that anything that he says may be used as evidence against him. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). These rights may be waived as long as the waiver is knowingly, intelligently, and voluntarily made. *Id.* at 444; *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citation omitted).

The Supreme Court recognizes two inquiries to determine whether an accused has voluntarily and knowingly waived his Fifth Amendment privilege against self-incrimination. *Moran*, 475 U.S. at 421; *Soffar v. Cockrell*, 300 F.3d 588, 592 (5th Cir. 2002). First, waiver of the right must be voluntary and not the product of intimidation, coercion or deception. *Moran*, 475 U.S. at 421. Second, the waiver or relinquishment must be made with full awareness of the nature of the right being waived. *Id.* In making these inquiries, the court must consider the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973).

The sole concern of the Fifth Amendment and *Miranda* is government coercion, and not the "moral and psychological pressures to confess emanating from sources other than official coercion." *Colorado v. Connelly*, 479 U.S. 157, 169 (1986) (citing *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)). Thus, the Supreme Court determined

that "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164.

The habeas corpus statute obliges federal judges to respect credibility determinations made by the state court trier of fact. *Pemberton*, 991 F.2d at 1225 (citing *Sumner*, 455 U.S. at 597). If the underlying facts as determined by the state court indicate the presence of some coercive tactic, however, the impact that factor had on the voluntariness of the confession is a matter for independent federal determination and is ultimately a legal determination. *Miller*, 474 U.S. at 117; *ShisInday*, 511 F.3d at 522.

In St. Cyre's case, as required by *Jackson v. Denno*, 378 U.S. 368 (1964), the state trial court conducted an evidentiary hearing on the admissibility of his confession, taking the testimony of Agent Everly. Agent Everly testified that, after securing the firearm found in the vehicle, he started speaking with St. Cyre.[34] Agent Everly recounted that Agent Abadie asked Agent Everly if he had read St. Cyre his *Miranda* rights.[35] Agent Everly then read St. Cyre his *Miranda* rights.[36] Agent Everly testified that Supervisor Lousteau was present in the room at the time.[37] According to Agent Everly, St. Cyre stated he understood his rights and agreed to waive them.[38] St. Cyre told Agent Everly that his aunt bought him the gun and gave

---

[34] R. Doc. 16-2 at 16, Hearing Transcript, 7/11/18.
[35] *Id.*
[36] *Id.* at 16–17.
[37] *Id.* at 51.
[38] *Id.* at 17.

it to him for protection.[39] Agent Everly described St. Cyre as contrite, and testified that St. Cyre explained that he had a young child and said that he did not want to go to jail for the rest of his life.[40] Thereafter, St. Cyre was charged with parole violations, arrested and booked.[41] The *Miranda* rights form executed by St. Cyre was admitted into evidence.[42] As noted, at the conclusion of the hearing, the state trial court denied the motion to suppress the statement.[43]

At trial, Agent Everly provided similar testimony that he read St. Cyre his *Miranda* rights and that St. Cyre said he understood his rights and waived them and provided a statement.[44] Agent Everly testified that he believed Agent Howell was standing near the door and heard the exchange, but explained that Agent Howell was not in the room when St. Cyre gave his statement.[45] Agent Everly explained that after St. Cyre was arrested and brought to the jail, Agent Everly again read him his *Miranda* rights and that St. Cyre executed a form waiving those rights.[46] Agent Everly testified that he was certain that he read St. Cyre his *Miranda* rights.[47]

Agent Howell testified that, once the firearm was secure, he returned to the office and went back and forth between his office and that of Supervisor Lousteau.[48]

---

[39] *Id.* at 18.
[40] *Id.*
[41] *Id.*
[42] *Id.* at 19.
[43] *Id.* at 58.
[44] R. Doc. 16-3 at 10–11, Trial Transcript, 7/17/18.
[45] *Id.* at 11, 22.
[46] *Id.* at 14–16.
[47] R. Doc. 16-3 at 94, 96, Trial Transcript, 7/18/18.
[48] *Id.* at 122, 127.

Agent Howell testified that he overheard St. Cyre tell Agent Everly that his aunt gave him the firearm for protection.[49]

Supervisor Lousteau testified that Agent Everly read St. Cyre his *Miranda* rights in her presence.[50] She recalled hearing St. Cyre acknowledging his rights and admitting that he knew the firearm was in the vehicle and stating that it was given to him by his aunt.[51] She testified that no one threatened or coerced St. Cyre into giving the statement.[52]

St. Cyre asks this Court to reassess the state courts' credibility determinations, including the determination that St. Cyre's inculpatory statement was given only after he was *Mirandized*. But this would require the Court to ignore, discount, and reassess the testimony presented by the state, which the Supreme Court has declared a federal habeas court cannot do. *Miller*, 474 U.S. at 117. St. Cyre has offered no clear and convincing evidence to discount the factual and credibility findings made by the state courts in denying him relief and those findings are supported by the record and testimony.

St. Cyre ultimately fails to present clear and convincing evidence to rebut the presumption that the findings of the state courts are correct and due deference here. He also has failed to establish that the denial of relief on this claim was contrary to

---

[49] *Id.* at 122–23, 127, 133.
[50] *Id.* at 137, 143.
[51] *Id.*
[52] *Id.* at 137–38.

or an unreasonable application of Supreme Court precedent. He is not entitled to federal habeas relief as to this claim.

### C. Habitual Offender Plea Violated Due Process of Law (Claim 5A)

St. Cyre claims that he was denied the right to due process because his habitual offender plea was taken in violation of Louisiana law. He specifically claims that the trial judge failed to inform him of his statutory right to remain silent, his right to a hearing, and the right to have the state prove its allegation that he is a habitual offender prior to accepting the stipulation that he was a habitual offender pursuant to La. Rev. Stat. § 15:529.1(D).

The state responds that the record demonstrates that St. Cyre was advised of his rights and that he both fails to show an unreasonable application of clearly established federal law and fails to rebut the presumption of correctness that attaches to the state court's determination that he was advised of his rights regarding the habitual offender bill of information. St. Cyre replies that he was not advised of his rights at the hearing when he entered a second felony offender guilty plea.

St. Cyre raised this claim in his application for post-conviction relief. The trial court initially noted that "Petitioner neglected to note that Defendant was read his rights under the Habitual Offender Bill when the Bill was originally filed."[53] In denying his claim, the trial court found as follows:

> **In Claim III**, Defendant argues that he was denied due process when he was not informed of his rights under the Habitual Offender Bill of

---

[53] R. Doc. 16-6 at 1142, Order and Reasons, 6/27/23.

Information as required under R.S. 15:529.1(D). He also urges a Strickland, ineffective assistance of counsel claim for Tonry's failure to object to this alleged defect. Contrary to Defendant's assertion, the transcript of August 1, 2018 when the Habitual Offender Bill was first filed demonstrate that the court informed defendant of all of his rights vis-à-vis that Bill. (Tr. 726-28) Therefore, since defendant was advised of his Habitual Offender rights, he was not denied due process and Tonry was not ineffective for failing to urge this alleged defect in these proceedings. This Claim has no merit.[54]

The Louisiana First Circuit Court of Appeal denied St. Cyre's related writ application without assigning reasons.[55] The Louisiana Supreme Court denied relief, finding that St. Cyre failed to show lower court error and failed to satisfy his post-conviction burden of proof under La. Code Crim P. art 930.2.[56]

To the extent that St. Cyre asserts that the trial court failed to follow the state habitual offender laws, his claim is not cognizable on federal habeas review. Federal habeas courts do not review alleged errors under state sentencing laws. *See, e.g.*, *Butler v. Cain*, 327 F. App'x 455, 457 (5th Cir. 2009) (claim that sentence violated state law is not cognizable in federal habeas proceeding); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987) (A "state's failure to follow its own sentencing procedures is not reviewable by federal habeas corpus."). "Errors of state law and procedure . . . are not cognizable unless they result in the violation of a federal constitutional right." *Lee v. Whitley*, No. 93-03791, 1994 WL 395071, at *3 (5th Cir. June 28, 1994) (holding that state judge's purported violation of state law in failing to inform the petitioner of his right against self-incrimination in the habitual offender proceeding was not

---

[54] *Id.* (footnote omitted).
[55] *St. Cyre*, 2023 WL 8016458, at *1; R. Doc. 16-8 at 56.
[56] *St. Cyre*, 384 So. 3d at 342; R. Doc. 16-6 at 1–2.

cognizable in a federal habeas corpus proceeding); *see also Payne v. Whitley*, 48 F.3d 529, 1995 WL 84049, at *2 (5th Cir. Feb. 6, 1995); *Odom v. Wheat*, No. 09-3028, 2009 WL 3199178, at *6 (E.D. La. Sept. 30, 2009) (order adopting report).

A federal court's habeas review hinges upon whether a criminal proceeding violated a defendant's constitutional rights such that the violation rendered the criminal proceeding fundamentally unfair under due process considerations. *Lisenba v. People of the State of Cal.*, 314 U.S. 219, 236–37 (1941); *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991) (explaining that habeas review is proper only to determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right). Claims under the Due Process Clause present a mixed question of law and fact, *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir. 2000), which requires this Court to determine whether the denial of relief on the claim was contrary to or an unreasonable application of federal law.

To the extent St. Cyre raises a federal claim related to his habitual offender hearing, that claim is meritless. St. Cyre fails to recognize that a state court multiple offender proceeding is not determinative of guilt or innocence, and the accused is not entitled to the full range of due process and other constitutional rights normally attendant to such adjudications. *Buckley v. Butler*, 825 F.2d 895, 902–03 (5th Cir. 1987). Thus, advice about one's constitutional rights has "only a limited application to multiple offender proceedings." *Joseph v. Butler*, 838 F.2d 786, 790 (5th Cir. 1988). As the United States Fifth Circuit Court of Appeals has explained:

> [I]n connection with guilty, or "true," pleas under state recidivist statutes, this circuit does not require that the full panoply of rights

> enunciated in *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed.2d 274 (1969), be extended to the defendant. *See Holloway v. Lynaugh*, 838 F.2d 792, 793 (5th Cir.), *cert. denied*, 488 U.S. 838, 109 S. Ct. 104, 102 L.Ed.2d 80 (1988). A guilty plea to an enhancement charge is valid if the "'totality of the circumstances' in the record demonstrates that the plea was voluntary and intelligent." *Swift v. Lynn*, 870 F.2d 1039, 1041 (5th Cir. 1989) (quoting *Holloway*, 838 F.2d at 793).

*Alexander v. Whitley*, 940 F.2d 946, 947 (5th Cir. 1991); *see also Joseph*, 838 F.2d at 789–90; *Swift*, 870 F.2d at 1041–42.

For a multiple offender plea to be considered knowing, "the defendant must have 'a full understanding of what the plea connotes and of its consequence.'" *United States v. Hernandez*, 234 F.3d 252, 255 (5th Cir. 2000) (quoting *Boykin*, 395 U.S. at 244). "The consequences of a guilty plea, with respect to sentencing, mean only that the defendant must know the maximum prison term and fine for the offense charged." *United States v. Rivera*, 898 F.2d 442, 447 (5th Cir. 1990); *Abies v. Scott*, 73 F.3d 591, 592 n.2 (5th Cir. 1996). A defendant who is aware of the maximum term of imprisonment he faces is aware of the consequences of his plea, thus rendering it valid for constitutional purposes. *Hobbs v. Blackburn*, 752 F.2d 1079, 1082 (5th Cir. 1985); *Hernandez*, 234 F.3d at 256–57 (explaining that, with respect to sentencing issues, a matter is a direct consequence of the plea only if it is related to either the length or nature of the sentence).

Here, the totality of the circumstances supports a finding that the plea to the double bill was knowing and voluntary. Contrary to St. Cyre's allegations, the record reflects that on August 1, 2018, at the multiple bill arraignment, the trial court read the allegations in the multiple bill to St. Cyre and advised him of his rights, including

the right to a hearing, counsel, to remain silent, and to be tried as to the truth of the allegations.[57] At that time, St. Cyre, who was represented by counsel, denied the allegations and a hearing was set for a later date.[58] St. Cyre filed objections to the habitual offender bill as well as a motion to quash.[59] Ultimately, the following month, St. Cyre withdrew his motion to quash and, in the presence of defense counsel, admitted to being a second felony offender pursuant to a plea agreement with an agreed upon sentence of thirty years.[60] While St. Cyre is correct that the trial court did not read his rights again at that hearing, St. Cyre's habitual offender adjudication was "closely related, temporally and functionally," to the multiple bill arraignment proceeding, and "the same defense counsel, ... court, and judge were involved in each." *Buckley*, 825 F.2d at 902. Moreover, St. Cyre's guilty plea to the multiple bill was entered pursuant to a favorable plea agreement that resulted in a double bill rather than a quadruple bill and a sentence of thirty years rather than a possible sentence of life in prison.

St. Cyre has failed to establish that the state court's denial of relief was contrary to or an unreasonable application of federal law. He is not entitled to relief on this claim.

---

[57] R. Doc. 16-3 at 263-65, Hearing Transcript, 8/1/18.

[58] *Id.* at 265.

[59] R. Doc. 16-1 at 193-95, Response and Objections to Habitual Offender Bill of Information Pursuant to La. R.S. 15:529.1, 8/2/18; *id.* at 201-02, Motion to Quash the Habitual Offender Bill of Information, 8/2/18.

[60] R. Doc. 16-3 at 270-71, Multiple Offender Hearing and Sentencing Transcript, 9/21/18.

## D.    Ex Parte Communication (Claim 5B[61])

St. Cyre claims that the trial judge had an ex parte communication with the jury in violation of due process. He specifically claims that the trial judge went into the jury deliberation room and provided the jurors with additional instructions. In support of his claim, St. Cyre points to two statements prepared and witnessed by his post-conviction counsel's investigator and signed by the jurors nearly three years after the trial.[62] The first statement asserts that, after the completion of testimony, "the judge came and spoke with us in the jury break room, which was connected to the main courtroom. The judge gave us instructions of how we were supposed to find the defendant guilty or not guilty and left. The defense attorney and prosecutor didn't come in and talk to us with the judge."[63] The second statement asserts that "[t]he judge gave us instructions in the deliberation room before we started discussing the case together, finally" and that, after the verdict "the judge dismissed us back to the deliberation room, where he came to thank us for our service before we left."[64] St. Cyre also relies on the investigator's affidavit affirming that she interviewed the two jurors and took the written statements from them.[65]

The state responds that St. Cyre fails to rebut the presumption of the correctness of the state court's factual determination that there were no ex parte

---

[61] This claim is embedded within Claim 5 of the amended petition. R. Doc. 11 at 47–49.

[62] R. Doc. 16-6 at 887–89, Statement of Ina Bodden, 5/19/21; *id.* at 890–92, Statement of Lindsey Hoover, 5/22/21.

[63] *Id.* at 888.

[64] R. Doc. 16-6 at 891–92, Statement of Lindsey Hoover, 5/22/21.

[65] R. Doc. 16-6 at 885–86, Affidavit of Neha Nimmagudda, undated.

communications with the jury during deliberations. St. Cyre replies that the state court's adjudication of his claim was based on an unreasonable and biased determination of the facts and violated clearly established law.

St. Cyre raised this issue in his application for post-conviction relief. The trial court initially noted that "Petitioner argues that the court gave its jury instructions in an ex-parte meeting in the jury room when the transcript clearly reflects otherwise." [66] The trial court, in finding no ex parte communication occurred, explained as follows:

> In Claim V, defendant makes the very serious claim that "the trial judge had ex-parte communications with the jury" in the jury deliberation room and that the judge instructed the jury outside the presence of counsel. This Claim is based on an affidavit from Posner's investigator, Neha Nimmagudda, regarding her conversations with two jurors, three years after the trial. It is understandable that the jurors might not have complete recollection of all the events of a three day trial three years before speaking about it with Posner's investigator. Nimmagudda was not on the jury and therefore not present in the jury room during deliberations, nor does she purport to having been present in the courtroom at any time during the trial. She therefore, had no personal knowledge of the events of the trial and her "affidavit" is not evidence of those events. The jurors themselves did not provide affidavits. Their "statements" are in the investigator's handwriting and presumably follow the chronology and version of the facts set out in her questioning.
>
> The court directs the reader's attention to the Minute entry of July 19, 2018 (Tr. 16-17) and the transcript of that date beginning on page 695 where the court read the jury instructions. A written copy of those instructions is a part of the record beginning on page 149. Immediately after reading the eight legal sized pages of instructions and prior to the beginning of deliberations, the State brough to court's attention a discrepancy between the written instructions and the court's reading of those instructions (Tr. 708). <u>Had the court instructed the jury in the jury room outside the presence of counsel, how would counsel know that the court had made a mistake</u>? The transcript reveals that a bench

---

[66] R. Doc. 16-6 at 1442, Order and Reasons, 6/27/23.

conference was then held <u>with all counsel</u> after which the court reread the instructions as written to the jury, with all counsel present, apologizing for a mis-statement. Then on page 709, "Now all right to all 12 of the jurors first selected, are each of you able to go forward into the jury room, deliberate, and reach a verdict in this case?"

Part of the jury instruction for the case at bar, and in fact, a standard instruction contained in <u>Louisiana Civil Law Treatise Volume 17, Criminal Jury Instructions and Procedure §3:12</u>, was read at Tr. Page 708: "If you have a question about the instructions I have given you, have the foreperson write it down and give it to the bailiff. Please be sure, in doing so not to reflect your vote or present thinking." The jury paid heed to this part of the instructions and pages 157 and 158 or the record are copies of written questions posed by the jury, and the court's written responses. The first question is "We would like to see multiple copies of the judge's instructions" to which the court responded "Louisiana law does not allow jury (sic) to have written instructions in the jury room." It makes no sense that if the judge was in the jury room giving instructions, that the jury would <u>write</u> a request when a verbalized request would have ended the inquiry.

In response to the written question at page 158 of the record, the court reread a portion of the instructions. The court then goes on (Tr. 713) "Would you all be in a position to go forward and conclude your deliberations? We'll be in recess to await a verdict. (At this time, the jury was retired at 1:51 p.m.)" Lastly, after the verdict was rendered and read (Tr. 715) "Folks, your job is complete. This last time we'll retire you, and if you have a moment, I'd love to visit with you before you're released for the week." To be clear, the transcript is unequivocal that the court instructed all members of the jury including the alternate, in open court with the bailiff, clerk, court reporter and <u>all counsel</u> present. After all deliberations were complete, and the verdict of the jury read and the jury polled, the judge met with the jury alone without counsel present. It is quite possible that after the verdict was rendered some jurors still had questions and the court's responses may have been the course of the two jurors' statements relative to ex-parte instructions.

Perhaps counsel and her investigator have little trial experience in this jurisdiction and are not aware that, <u>after a verdict is rendered, most, if not all</u> of the judges in the Twenty-Second Judicial District will meet with jurors to thank them for their service and answer any remaining questions. Those conversations typically take place without counsel present. **That is exactly what happened in the case at bar.**

"Considering the evidence before this Honorable Court, Mr. St. Cyre contends he is entitled to have his conviction vacated because the trial judge's ex-parte communication was improper." (Supplement paragraph 128) Nimmagudda's affidavit is not "evidence" of what transpired in the jury room, nor are the "statements" in Nimmagudda's hand purportedly from two jurors. The "Honorable Court" counsel is asking to vacate defendant's conviction based on her allegation of improper interaction of the court with the jury is the same court she has accused of that serious violation of Defendant's rights. A violation that did not occur. This claim has no merit.[67]

The Louisiana First Circuit Court of Appeal denied St. Cyre's related writ application without assigning reasons.[68] The Louisiana Supreme Court denied relief, finding that petitioner failed to show lower court error and failed to satisfy his post-conviction burden of proof under La. Code Crim P. art 930.2.[69]

The Due Process Clause guarantees an accused the right to an impartial jury that will determine guilt based on the evidence and the law as instructed, rather than on preconceived notions or extraneous information. *Morgan v. Illinois*, 504 U.S. 719, 726–27 (1992); *Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984). "[T]he Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to an external influence." *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008). However, the United States Supreme Court has made clear that the Constitution does not mandate a new trial every time a juror is placed in a potentially compromising but harmless situation. *United States v. Olano*, 507 U.S. 725, 738–39 (1993) (citing *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).

---

[67] *Id.* at 1443–45.
[68] *St. Cyre*, 2023 WL 8016458, at *1; R. Doc. 16-8 at 56.
[69] *St. Cyre*, 384 So. 3d at 342; R. Doc. 16-6 at 1–2.

Ex parte communications between a judge and the jury may violate a defendant's due process rights. *United States v. Gagnon*, 470 U.S. 522, 526 (1985). There is no automatic presumption of harm, however, just because an ex parte communication occurred. *Rushen v. Spain*, 464 U.S. 114, 133 (1983). "[E]x parte communications between a judge and a juror are questions of federal law, while the substance and effect of such communications present questions of historical fact." *Rhodes v. Cain*, No. 11-399, 2014 WL 556734, at * 18 (E.D. La. Feb. 11, 2014) (citing *Rushen*, 464 U.S. at 120).

As previously indicated, the state court found that no ex parte communication between the trial court and the jury occurred. AEDPA requires this Court to presume the finding to be correct and St. Cyre bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El*, 537 U.S. at 340. This deference to factual findings extends to credibility determinations made by the state courts. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Hall v. Quarterman*, 534 F.3d 365, 371 n.22 (5th Cir. 2008) ("State credibility determinations also receive AEDPA deference on habeas review, but not when overcome by clear and convincing evidence."); *Richards v. Quarterman*, 566 F.3d 553, 563 (5th Cir. 2009) (holding that state court credibility determinations are entitled to presumption of correctness under § 2254(e)(1)). This presumption of correctness "is especially strong when, as here, the state habeas court and the trial court are one and the same." *Murphy v. Johnso*n, 205 F.3d 809, 813 (5th Cir. 2000). For the following reasons, St. Cyre fails to meet that burden.

Neither affidavit of the investigator nor the statements signed by two jurors constitute clear and convincing evidence. As noted by the trial court, the investigator was not present at the trial and does not have firsthand knowledge of what occurred there. As the trial court also noted, the interviews of the jurors by St Cyre's investigator occurred nearly three years after the conclusion of the three day trial and their statements are unreliable. *Carroll v. Jackson*, No. 18-12380, 2021 WL 4847128, at *12 (E.D. Mich. Oct. 18, 2021) (juror affidavits signed four years after trial less reliable), *certificate of appealability denied*, *Carroll v. Macauley*, No. 21-1730, 2022 WL 16985825 (6th Cir. June 1, 2022); *see also Crowe v. Terry*, 426 F. Supp. 2d 1310, 1347 n. 31 (N.D. Ga. Sept. 30, 2005) (finding juror affidavit executed seven years after serving on the jury unreliable), *aff'd*, 490 F.3d 840 (11th Cir. 2007).

Further, the jurors' statements are belied by the other evidence of record. Both the trial minutes and the trial transcript reflect that the trial court instructed the jury in the courtroom.[70] At one point during the reading of those instructions, counsel requested to approach the bench and advised the trial court that it misspoke.[71] Defense counsel in fact requested the trial court to "clarify" the matter.[72] The trial court then reread to the jury one line of the instructions relating to responsive verdicts.[73] Thereafter, the trial court released the alternate juror and the jury retired

---

[70] R. Doc. 16-3 at 229–43, Trial Transcript, 7/19/18, R. Doc. 16-1 at 35, Trial Minutes, 7/19/18.
[71] *Id.* at 243–44.
[72] *Id.* at 244.
[73] *Id.*

to deliberate.[74] During deliberations, the jury sent two notes over the course of an hour.[75] In response to the second note, the jury was returned to courtroom and the trial court again read the instruction relating to possession.[76] The jury then retired to continue deliberations and, twelve minutes later, returned to courtroom to render the verdict.[77] At the conclusion of the proceedings, the trial judge stated that he was going to "take a moment and visit with the jury."[78]

Given the foregoing evidence, the state court finding that there was no ex parte communication with the jury was a reasonable determination of the facts. Furthermore, the state court's decision was not an unreasonable application of clearly established Supreme Court law. St. Cyre is not entitled to relief as to this claim.

### D. Ineffective Assistance of Counsel (Claims Three & Four)

St. Cyre alleges that he received ineffective assistance of counsel at trial, during his habitual offender proceedings and on appeal. The State responds that St. Cyre fails to show that the state courts unreasonably applied the standard in *Strickland v. Washington*, 466 U.S. 668 (1984).

St. Cyre raised his claims of ineffective assistance of counsel in his application for post-conviction relief. The trial court found that St. Cyre failed to meet the standard in *Strickland*.[79] The Louisiana First Circuit Court of Appeal denied St.

---

[74] *Id.* at 244–45; R. Doc. 16-1 at 35, Trial Minutes, 7/19/18.
[75] *Id.* at 245–46; R. Doc. 16-1 at 35, Trial Minutes, 7/19/18.
[76] *Id.* at 246–48; R. Doc. 16-1 at 35, Trial Minutes, 7/19/18.
[77] *Id.* at 248–50; R. Doc. 16-1 at 35, Trial Minutes, 7/19/18.
[78] *Id.* at 251.
[79] R. Doc. 16-6 at 1142, 1145–52, Order and Reasons, 6/26/23.

Cyre's related writ application without assigning reasons.[80] The Louisiana Supreme Court denied relief, finding that petitioner failed to show lower court error and failed to satisfy his post-conviction burden of proof under La. Code Crim P. art 930.2.[81]

The clearly established federal law governing such claims is *Strickland*. In *Strickland*, the United States Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 697.

When assessing whether counsel's performance was deficient, a court must always be mindful that "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Richter*, 562 U.S. at 110. Therefore, "[t]o establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 104 (quotation marks omitted). Moreover, the Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

---

[80] *St. Cyre*, 2023 WL 8016458, at *1; R. Doc. 16-8 at 56.
[81] *St. Cyre*, 384 So. 3d at 342; R. Doc. 16-6 at 1–2.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (citations and quotation marks omitted).

*Strickland*'s prejudice component is no less exacting. The Supreme Court has

explained:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

*Richter*, 562 U.S. at 111–12 (citations and quotation marks omitted).

Because St. Cyre's ineffective assistance of counsel claims were denied on the

merits in state court, AEDPA's deferential standards of review apply to this Court's

review. Therefore, to prevail on his claims in this federal proceeding, petitioner must

show that the state court decision denying the claims on the merits was "contrary to,

or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1);

*Adekeye v. Davis*, 938 F.3d 678, 682 (5th Cir. 2019); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

Moreover, where, as here, the state court correctly identified *Strickland* as the controlling federal law in its denial of the claim, the question on habeas review "is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. The Supreme Court has cautioned:

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (citation and quotation marks omitted). Therefore, "[f]ederal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105. As a result, in effect, the federal habeas court must "afford **both** the state court **and** the defense attorney the benefit of the doubt." *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (emphasis added; quotation marks omitted).

Applying these stringently deferential standards of review, this Court finds that, for the following reasons, the state court correctly and reasonably denied St. Cyre's ineffective assistance claims on the merits.

1.      **Failure to Object to Inadmissible Character Evidence**

St. Cyre claims that his counsel was ineffective when he failed to object to inadmissible character evidence at trial under *State v. Johnson*, 389 So. 2d 373 (La. 1980). He specifically contends that counsel failed to object when the prosecution indicated that it intended to cross-examine Chelsea St. Cyre about prior marijuana use and two guns St. Cyre possessed when he was shot.

On appeal, St. Cyre argued that the trial court erred in allowing the state to present prejudicial evidence without probative value to the jury after previously ruling such evidence inadmissible. In the last reasoned opinion, the Louisiana First Circuit found as follows:

> In his third assignment of error, the defendant argues that the trial court erred in permitting the State to present prejudicial evidence without probative value to the jury after previously ruling such evidence inadmissible.
>
> Louisiana Code of Evidence article 404(B)(1) provides:
>
>> Except as provided in Article 412, evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of such purposes, or when it relates to conduct that constitutes an integral part of the act of transaction that is the subject of the present proceeding.
>
> Generally, evidence of criminal offenses other than the offense being trial is inadmissible as substantive evidence because of the substantive risk of grave prejudice to the defendant. In order to avoid the unfair inference that a defendant committed to a particular crime simply

because he is a person of criminal character, other crimes evidence is inadmissible unless it has an independent relevancy besides simply showing a criminal disposition. **State v. Lockett**, 99-0917 (La. App. 1st Cir. 2/18/00), 754 So. 2d 1128, 1130, <u>writ denied</u>, 2000-1261 (La. 3/09/01), 786 So. 2d 115. The trial court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. See **State v. Galliano**, 2002-2849 (La. 1/10/03), 839 So. 2d 932, 934 (per curiam).

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. Code Evid. art. 401. All relevant evidence is admissible except as otherwise provided by positive law. Evidence which is not relevant is not admissible. La. Code Evid. art. 402. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, or waste of time. La. Code Evid. art. 403.

Pretrial, the State filed a notice of intent and an amended notice of intent to introduce other crimes evidence, or res gestae, pursuant to La. Code Evid. art. 404(B). The state's notice included evidence that the defendant had been shot and was recovering from a gunshot wound when the events of the instant case transpired; that the defendant was given a drug screen and tested positive for marijuana, benzodiazepine, and oxycodone; that the defendant admitted to recently using marijuana; and that marijuana crumbs were located on the floorboard behind the driver's seat next to the gun.

At the motion to suppress hearing, Agent Everly testified that on or around November 27, 2017, he received a call from a detective with the Sheriff's Office notifying him that the defendant had been involved in a shooting.[3] The detective sent Agent Everly a report about the incident and, according to Agent Everly, it was reported to be an attempted carjacking, and the defendant returned fire with two handguns.

[3] At the **Prieur** hearing, defense counsel indicated the defendant had been shot on November 5, 2017.

At the **Prieur** hearing, <u>see</u> **State v. Prieur**, 277 So.2d 126, 130 (La. 1973), the State indicated that, while it intended to introduce the fact that the defendant had been shot, it did not intend to introduce evidence that the defendant returned fire. The trial court ruled that the fact that the defendant was shot on November 5, 2017 was admissible. The trial

court also ruled, "Further information about that shooting, unless there's other material developments in the trial, will not be admitted." Finally, the trial court ruled that absent any further developments in the case, the drug test and marijuana crumbs were inadmissible. The trial court added, however, that it "can see circumstances where that door might be opened."

During the State's case-in-chief, none of the prohibited evidence was addressed. Agent Everly testified at trial that he attempted several times to contact the defendant in person, in November and December of 2017, but was never able to meet with him. Agent Everly finally made contact with the defendant in late December of 2017, and told him to be in his office that day. The defendant did not show up on that day. Agent Everly contacted the defendant again, and told him to be in his office on January 3, 2018. The defendant again did not show up, but unexpectedly, without an appointment, arrived at Agent Everly's office on January 9, 2018. On cross-examination, defense counsel attempted to impeach Agent Everly's credibility regarding his alleged attempts to contact the defendant. That is, defense counsel sought to show that the defendant had, in fact, made contact with Agent Everly several times in November and that the agent was not being truthful when he testified that he never talked to the defendant around this time.

In the defendant's case-in-chief, Chelsea testified that she overheard several phone conversations the defendant had with Agent Everly in November 2017. According to Chelsea, the defendant told Agent Everly what was going on, and that he was going to come in to see him; he also gave the agent his new address and new cell phone number. Later, defense counsel asked Chelsea, "Can you tell me what really happened January 9, 2018?" Chelsea indicated the following. They drove to Agent Everly's office, and she stayed in the defendant's aunt's car with her baby. She discovered a gun under the seat. The defendant came back to the car to go to the post office to obtain a money order (for the paperwork transfer fee). At the post office, Chelsea told the defendant about the gun, and the defendant told her that he did not know what it was for, and told her not to mess with it. Later, when she got the text message, "Get that gun from underwear rite," she did not know what it meant. When the agent approached her and told her to tell him where the gun was, she said it was underneath the driver's seat. Chelsea testified that the defendant did not know there was a gun under the seat. She also testified that the defendant never looked at the gun.

Then the following relevant exchange took place between Chelsea and defense counsel:

Q. What was Ronald doing for a living prior to this arrest?

A. Working driving trucks for Champagne Beverage.

Q. I'm going show you some documents, and I'm going to mark them as D 23, D 24, and D 25. Can you identify Exhibit D 23 for this jury?

A. Yes. That's his CDL license that he — well, certificate diploma for school.

Q. Is that a photograph of the diploma?

A. Oh, yes.

Q. Did you take that photograph?

A. Yes, I did.

Q. When did Ronald get his commercial truck driver's license?

A. The 16th of March. I'm sorry, the 29th.

Q. Of what year?

A. '16.

Q. And would that have been after he got out of jail from 2012?

A. Yes.

Q. I'm going to show you another picture I'm going mark for identification as D 24. Did you take that photograph?

A. Yes, I did.

Q. Can you identify it?

A. Yes. This is his TWIC card.

Q. A TWIC card. When did he get that?

A. In '16.

Q. In 2016. Again, was that after he got out of jail in 2012?

A. Yes.

Q. I'm going to show you this and it's marked D 25. Can you recognize that photograph?

A. Yes.

Q. Did you take that photograph?

A. Yes, I did.

Q. What is that?

A. This is GED, his diploma.

Q. When did he get his GED?

A. February of '16.

Q. So after Ronald got out of jail, he got his GED, he got a TWIC card, and he got a commercial driver's license?

A. Yes.

Q. You were with him at the time he got all of these things?

A. Yes, I was, and he worked so hard to get that. Hard.

Q. He had to take a test to get his GED?

A. Yes, he had to take a test for that that he failed and he continued to go back and strive to get. His TWIC card he got denied for three times that he fought for, didn't give up and went back and got. And also his commercial truck driver's license, he had to take a test for that, and he also failed that the first time, but he continued to go back and strived to get that, and he got everything that he needed.

Following brief cross-examination of Chelsea, a bench conference was held. The State argued that the defense, through Chelsea, had offered character evidence and that, as such, it (the State) had the right to go into specific incidents of bad acts of the defendant. The jury was excused, and the State provided to the trial court a list of other crimes or bad acts, including several prior convictions, it sought to introduce. Defense counsel argued that what Chelsea had testified to was not character evidence. The jury was dismissed for the evening, and the trial court continued the **Johnson** hearing[4] to the following day.

[4] See **State v. Johnson**, 389 So.2d 372 (La. 1980).

The next day, with the jurors in the jury room, the trial court resumed the **Johnson** hearing. The State had prepared a memorandum in support of its motion to rebut the defendant's character evidence. Defense counsel addressed the State's memorandum. In ruling partially in favor and partially against the State, the trial court provided the following, in pertinent part:

> This Court has reviewed cases going back into the 1930s dealing with evidence of good character and purported rebuttal or evidence confronting that witness to determine whether that would make a difference in their testimony.

> I've also had prepared a partial transcript, which both counsel have been made aware of and have been given access to and copies of in preparation for this ruling.

> The statements by the witness are evidence of good character, and thus, evidence which may be admitted to confront the witness under 404 is admissible. The caveat is that evidence post-release from the, what I believe to be, a felon with a firearm in 2012 is more probative than prejudicial, or unduly prejudicial on that point. Evidence prior to the 2012 release from incarceration, whenever that date may have been, is not admissible.

> Further, I've made a determination earlier that the reliability of the evidence in the **Johnson** hearing that was urged to me of alleged marijuana crumbs on January 9th of 2018 is not substantial enough to allow it to pass a **Johnson** hearing test.

The trial court also ruled that the defendant's admission to recently using marijuana was admissible.

Following is the relevant cross-examination of Chelsea that the defendant contends was prejudicial:

> Q. Ms. St. Cyre, have you heard that on the date of the incident for which we're in court today, on that date, your husband, Mr. St. Cyre, admitted to marijuana use?
>
> A. No.
>
> Q. Have you heard that prior to this incident, your husband was involved in a shooting in November of '17?
>
> A. Yes.
>
> Q. And when those individuals opened fire on your husband, he was actually holding your infant daughter?
>
> A. Yes.
>
> Q. And that when that happened, he dropped your daughter and retrieved a firearm from his own vehicle?
>
> A. I wasn't there when that happened.
>
> Q. And have you heard that your husband actually returned fire?
>
> A. No. I wasn't there.
>
> Q. Have you heard that marijuana was located in his residence?
>
> A. No.
>
> Q. Are you aware that Mr. St. Cyre told his parole officer that the firearm that was located in the vehicle on the date of this incident for which we're here for trial, he told his parole officer that it was his aunt's and she gave it to him for protection?
>
> A. No, she didn't give it to him.
>
> Q. I asked are you aware that your husband made the statement that she did give it to him for protection?

A. No.

The defendant argues in brief that the direct examination of Chelsea about the defendant's job and schooling was not character evidence because there was no foundation laid for Chelsea's knowledge of the defendant's reputation in the community. As such, the State should have been prohibited from asking Chelsea on cross-examination about specific acts by the defendant. The defendant further contends that the prejudice by the State's cross-examination was compounded because the State was allowed to ask improper questions without foundation. According to the defendant, the trial court failed to consider three of the five **Johnson** factors; namely, it did not consider whether there was reasonable likelihood of generalized knowledge of the defendant's previous misconduct within his community; it did not consider whether the cross-examination concerned the specific trait involved in possession of a firearm by a convicted felon; and it did not determine that the examination would be in proper form.

Louisiana Code of Evidence article 608 provides:

> **A.    Reputation evidence of character.** The credibility of a witness may be attacked or supported by evidence in the form of general reputation only, but subject to these limitations:

> (1) The evidence may refer only to character for truthfulness or untruthfulness.

> (2) A foundation must first be established that the character witness is familiar with the reputation of the witness whose credibility is in issue. The character witness shall not express his personal opinion as to the character of the witness whose credibility is in issue.

> (3) Inquiry into specific acts on direct examination while qualifying the character witness or otherwise is prohibited.

> **B.    Particular acts, vices, or courses of conduct.** Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.

**C. Cross-examination of character witnesses.** A witness who has testified to the character for truthfulness or untruthfulness of another witness may be cross-examined as to whether he has heard about particular acts of that witness bearing upon his credibility.

One of the comments to Article 608 refers to **Johnson**, regarding the safeguards the trial court should consider before permitting such questioning. See **State v. Law**, 2015-0210 (La. App. 1st Cir. 2/24/16), 189 So.3d 1164, 1175, writ denied, 2016-0926 (La. 4/24/17), 220 So.3d 740. In **Johnson**, 389 So.2d at 376, the supreme court set out the following guidelines that the trial court should consider in determining whether to allow the cross-examination:

> "(1) that there is no question as to the fact of the subject matter of the rumor, that is, of the previous arrest, conviction, or other pertinent misconduct of the defendant;
>
> "(2) that a reasonable likelihood exists that the previous arrest, conviction or other pertinent misconduct would have been bruited about the neighborhood or community prior to the alleged commission of the offense on trial;
>
> "(3) that neither the event or conduct nor the rumor concerning it occurred at a time too remote from the present offense;
>
> "(4) that the earlier event or misconduct and the rumor concerned the specific trait involved in the offense for which the accused is on trial; and
>
> "(5) that the examination will be conducted in the proper form, that is: 'Have you heard,' etc., not 'Do you know,' etc.

The trial court herein specifically noted that it was conducting a **Johnson** hearing to determine the extent of cross-examination allowed by the State. The trial court is presumed to know the law, see **State v. Aldridge**, 450 So.2d 1057, 1059 (La. 1984), and there is nothing in the record before us to indicate the trial court did not consider the **Johnson** guidelines in formulating its ruling. Moreover, while the defendant clearly objected to other crimes or bad acts being allowed into evidence, it made no objections regarding any of the three guidelines that he now asserts on appeal were not considered by the trial court. The **Johnson**

55

Court, 389 So.2d at 377, noted that a defendant may not avail himself of these safeguards if he failed to make a contemporaneous objection on these grounds at trial. A defendant is limited on appeal to the grounds for the objections articulated at trial. Generally speaking, a new basis for an objection, albeit meritorious, cannot be raised for the first time on appeal. See La. Code Crim. P. art. 841. At any rate, we see no reason to disturb the trial court's ruling. Defense counsel's questions to Chelsea about the defendant's employment and educational history and what he knew about the gun in the vehicle constituted character evidence and, as such, the State was allowed to rebut such evidence.

Louisiana Code of Evidence article 611(B) provides that a "witness may be cross-examined on any matter relevant to any issue in the case." The scope of cross-examination is not limited to matters covered on direct examination. **State v. Sepulvado**, 93-2692 (La. 4/8/96), 672 So.2d 158, 167, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). The introduction of evidence of "good character" places character at issue, thereby permitting the State to cross examine the defendant's character witness about his or her knowledge of the defendant's particular conduct, prior arrests, or other acts relevant to the moral qualities pertinent to the defendant's crime and to introduce evidence of the defendant's bad character in rebuttal of the testimony of the defendant's character witness. **State v. Taylor**, 2007-869 (La. App. 5th Cir. 4/29/08), 985 So.2d 266, 269; see La. Code Evid. art. 608(C); La. Code Evid. art. 405(A). Although **Johnson** delineated certain safeguards regulating prosecution cross-examination of character witnesses, the ultimate question is whether there was undue jury prejudice from the prosecutor's cross-examination. **Sepulvado**, 672 So.2d at 167.

Chelsea's testimony on direct examination placed the defendant's character for truthfulness squarely before the jury. Much of what she testified to, regarding the defendant's knowledge of the gun, was in direct contradiction to Agent Everly's testimony. Without calling the defendant to testify, defense counsel sought to establish the defendant's good character or truthfulness and, therefore, his innocence, through Chelsea. Accordingly, we find that the scope of the cross-examination of Chelsea was proper. See La. Code Evid. art. 405(A); La. Code Evid. art. 608(A); La. Code Evid. art. 611(B); Law, 189 So.3d at 1176. See also **State v. Bagley**, 378 So.2d 1356, 1357-58 (La. 1979).

This assignment of error is without merit.[82]

---

[82] *St. Cyre*, 292 So. 3d at 105–111; R. Doc. 16-5 at 64–66.

St. Cyre then raised the issue of ineffective assistance of counsel for failing to argue all the elements of *Johnson* in his application for post-conviction relief. The trial court, in rejecting the claim, explained:

> In Claim 1, counsel argues that trial counsel, Tonry was ineffective during trial. The Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L Ed. 2d 674 (1984) set forth the standard for analysis of an ineffective assistance of counsel claim as follows:
>
>> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's error were so serious as to deprive the defendant of a fair trial, a trial whose results is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that render the result unreliable.
>
> "Courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and scrutiny of counsel's performance must be highly deferential." (emphasis added) Rose v. Flores-Ortega, 528 U.S. 470, 120 S. Ct. 1029, 1034-35, 145 L. Ed. 2d 985 (2000). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making an evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. Louisiana, supra, 350 U.S., at 101, 76 S. Ct., at 164. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, The Trial for Life:

<u>Effective Assistance of Counsel in Death Penalty Cases</u>, 58 N.Y.U.L.Rev. 299, 343 (1983).

Paragraph 64 of the Supplement states "trial counsel has a duty to object to the introduction of impermissible character evidence." The issue of character evidence began during Tonry's questioning of Defendant's wife about his work and educational history at the end of a day's testimony. The State then argued that those facts were introduced as evidence of Defendant's good character which the State was then able to rebut. The First Circuit extensively analyzed the issue of Defendant's evidence of character (Pages 18 – 27 of the First Circuit's issued judgment and pages 105 – 111 of the Westlaw version) and held "Defense counsel's questions to Chelsea about the defendant's employment and educational history and what he knew about the gun in the vehicle constituted character evidence and, as such, the State was allowed to rebut such evidence." <u>State v. St. Cyre</u>, 2019-0034 (La. App. 1 Cir. 12/19/19), 292 So. 3d 88, 110.

Counsel argues that Tonry should have argued all of the specific elements of <u>State v. Johnson</u>, 389 So. 2d 372, 376-77 (La. 1980) and that failure to do so was a <u>Strickland</u> violation. Hindsight might suggest that Tonry should have cited specific elements of specific cases during the heat of trial. However, the court does not find that his performance on the character evidence as a whole defective. Tonry argued this evidentiary issue aggressively when it was raised by the State and the court excused the jury to consider the issue more thoroughly. The next morning, Tonry and the State argued their respective positions during which Tonry referenced <u>Johnson</u> (Tr. P 647). The court again took a recess to "look at least one more case." Shortly thereafter the court held as follows:

> This court has reviewed cases going back into the 1930's dealing with evidence of good character and purported rebuttal or evidence confronting that witness to determine whether that would make a difference in their testimony …The statements by the witness are evidence of good character, and thus, evidence which may be admitted to confront the witness under 404 is admissible. (Tr. 650)

It is clear that the court considered the <u>Johnson</u> factors in its ruling as it referred to the arguments as the "<u>Johnson</u>" hearing. (Tr. p. 651)

The State's cross examination of Ms. St. Cyre relative to her husband's character was very short.

Q. Ms. St. Cyre, have you heard that on the date of the incident for which we're in court today, on that date, your husband, Mr. St. Cyre, admitted to marijuana use?

A. No.

Q. Have you heard that prior to this incident, your husband was involved in a shooting in November of '17?

A. Yes.

Q. And when those individuals opened fire on your husband he was actually holding your infant daughter?

A. Yes.

Q. And that when that happened, he dropped your daughter and retrieved a firearm from his own vehicle?

A. I wasn't there when that happened.

Q. Have you heard that marijuana was located in his residence?

A. No.

Q. Are you aware that Mr. Cyre told his parole officer that the firearm that was located in the vehicle on the date of this incident for which we're here for trial, he told his parole officer that it was his aunt's and she gave it to him for protection?

A. No, she didn't give it to him.

Q. I asked are you aware that your husband made the statement that she did give it him for protection?

A. No. (Tr. 654-655)

Prior to this portion of the trial, day three, the jury had already been told that Defendant was a convicted felon who was on parole. In the reading of the Bill of Information at the beginning of trial they were told that he had previously been convicted of the same crime, as well as possession of a legend drug without a prescription and possession of marijuana, second offense.

The First Circuit concluded "the ultimate question in whether there was undue jury prejudice from the prosecutor's cross examination…accordingly, we find that the scope of the cross examination of Chelsea was proper." <u>State v. St. Cyre, supra</u>. To the extent that the First Circuit considered any of Defendant's character evidence arguments, they are subject to dismissal under <u>La. C.Cr.P. Art. 930.4</u>. To the extent they were not raised in that court, <u>La. C.Cr.P. Art 930.4</u> also provides for dismissal.

To show prejudice under <u>Strickland</u>, "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Tonry's arguments at the <u>Jackson</u> [sic] character evidence stage of trial were well thought out, adequately argued and entitled to deference. The State's eight questions posed to Defendant's wife were minor elements of the three day trial. Considering the record as a whole, this court fails to find that Tonry's failures as alleged in the Application as to the character evidence were so significant as to have changed the outcome of the trial. The First Circuit found no undue prejudice on this issue and this court similarly finds no undue prejudice resulting from that evidence under the <u>Strickland</u> standards.[83]

The Louisiana First Circuit Court of Appeal denied St. Cyre's related writ application without assigning reasons.[84] The Louisiana Supreme Court denied relief, finding that petitioner failed to show lower court error and failed to satisfy his post-conviction burden of proof under La. Code Crim P. art 930.2.[85]

Initially, while St. Cyre argues that his counsel failed to object to the evidence of prior bad acts,[86] it is clear from the record that defense counsel objected to the eliciting of the testimony and vigorously argued against the evidence the state sought

---

[83] R. Doc. 16-6 at 1145–49, Order and Reasons, 6/26/23 (footnotes omitted).

[84] *St. Cyre*, 2023 WL 8016458, at *1; R. Doc. 16-8 at 56.

[85] *St. Cyre*, 384 So. 3d at 342; R. Doc. 16-6 at 1–2.

[86] R. Doc. 11 at 35–36 ("Failure to Object to Improper Use of Evidence at Trial" and "*Richard Tonry's Failure to Object to the Admission of Improper Evidence*").

to introduce.[87] Furthermore, defense counsel was partially successful in his objection in that the trial court found that evidence prior to St. Cyre's release from incarceration as well as evidence of the existence of marijuana crumbs on January 9, 2018 was not admissible.[88] The fact that defense counsel was not completely successful does not render counsel ineffective. *See Martinez v. Dretke*, 99 F. App'x 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.").

In reality, St. Cyre claims that his counsel's argument was inadequate and that he should have argued that the trial court should consider whether: (1) there was a reasonable likelihood of generalized knowledge of Mr. St. Cyre's previous misconduct within the community; (2) the state's proposed line of cross-examination "concerned the specific trait involved" in the possession of a firearm by a convicted felon; and (3) the examination would be in proper form.[89]

St. Cyre fails to acknowledge in either his amended petition or his sur-reply that the Louisiana First Circuit Court of Appeal, in the last reasoned opinion, ultimately found on direct appeal that "the scope of the cross-examination of Chelsea was proper," there was no undue prejudice to St. Cyre, and that the trial court did not err in allowing the evidence.[90] Given that the state courts found no error in the

---

[87] R. Doc. 16-3 at 163–64, 167–71, Trial Transcript, 7/18/18; *id.* at 178–83,185–86, Trial Transcript, 7/19/18.

[88] R. Doc. 16-3 at 184, Trial Transcript, 7/19/18.

[89] R. Doc. 11 at 37–39; R. Doc. 33 at 16.

[90] *St. Cyre*, 292 So. 3d at 110–11 (citations omitted); R. Doc. 16-5 at 65–66.

admission of the prior bad acts evidence, St. Cyre fails to show his counsel was ineffective or any resulting prejudice.

The state court's denial of relief was not contrary to or an unreasonable application of *Strickland*. St. Cyre is not entitled to relief as to this claim.

### 2.    Ineffective Assistance at Sentencing

St. Cyre also argues that his trial counsel was ineffective during his sentencing proceedings in failing to investigate and present mitigation evidence. St. Cyre specifically asserts that his counsel failed to present any evidence as to why the trial court should not sentence him to the lower end of the sentencing range, including witnesses and expert testimony. He claims that his social history, traumatic childhood, employment history and non-violent criminal history warranted a sentence on the lower end of the sentencing range. He further faults his counsel for failing to file a motion to reconsider sentence thus denying him the opportunity of appellate review of the sentence. He contends that had his counsel moved for reconsideration with mitigation evidence, the sentencing judge would have departed from the thirty-year sentence.

The state responds that the state courts did not unreasonably apply *Strickland* in denying relief.[91] In his sur-reply, St. Cyre argues that his counsel was also ineffective during the plea bargaining stage in that he failed to conduct "any kind of

---

[91] R. Doc. 25 at 15.

mitigation investigation" and therefore was "totally unprepared to negotiate with the State during the habitual offender proceeding."[92]

The trial court, in rejecting St. Cyre's claim on post-conviction relief, explained as follows:

> **Claim II** concerns ineffective assistance of counsel at sentencing. Paragraph 93 of the Supplemental Application argues that Tonry was ineffective "because he failed to investigate and present mitigation evidence at either his sentencing or habitual offender hearings, and also failed to move to have his sentence reconsidered." Admittedly, the record does not contain any reference to mitigation evidence or a motion for reconsideration. However, the record does not reflect <u>all</u> of the conversations that obviously occurred between the State and Tonry, before and after trial and most particularly, before the final Habitual offender sentence was imposed.
>
> As background, the reader is directed to the Habitual Offender Bill of information setting forth defendant's lengthy criminal history. (Tr. 172) While the court does not have access to Tonry's file, it undoubtably establishes knowledge of Defendant's "quad bill status" gleaned prior to trial. More than likely, the State was unwilling to offer any reduction of the charges in the original Bill of information or any concession as to Defendant's bill status prior to trial. Given that defendant's possession of the firearm in question at the time it was found by Probation/Parole was not direct, but only "constructive," it was not unreasonable strategy for Tonry to take the case to trial. A not guilty verdict was a reasonable possibility.
>
> The transcript is very clear that the State and defendant entered into a compromise. **"We've entered a plea agreement that Ronald will accept a double bill of thirty (30) years."** (Tr. 732) Winston's appellate brief (page 5) mentions that agreement. "On September 21, 2018 Mr. St. Cyre admitted to the allegations in the multiple Offender Bill of Information pursuant to a plea agreement." As a "quad bill" felon with a firearm, Defendant faced the possibility of a life sentence without the possibility of probation, parole or suspension. As only a double bill defendant's maximum sentence was only forty years. Whether Tonry argued the type of mitigation evidence offered by in the Application or some other justification for the State to agree to the thirty year

---

[92] R. Doc. 33 at 18.

sentence[7], the fact is that an agreement was reached; a binding contract between the parties, for imposition of a middle of the road sentence. The State gave as consideration a reduction in defendant's bill status. Defendant's consideration was a thirty year without benefit sentence. After the State made its concessions, had Defendant offered the type of mitigating evidence supplied in this Application or urged a Motion to Reconsider, the State would have been well within its rights to consider the contract breached and withdraw its generous second offender, thirty year agreement.

[7] There is some indication that defendant might have possessed information that might have been helpful to the State or the Federal Bureau of Alcohol, Tobacco and Firearms in other matters.

"It is abundantly clear that Mr. St. Cyre is serving a thirty-year sentences without access to any diminution of sentence for good time or parole for a non-violent crime. It is further abundantly clear that Mr. St. Cyre's criminal history includes no crimes of violence or sexual offense." (Supplement Par. 100) These facts are true. However, Mr. St. Cyre lost good time because he repeatedly broke the law, even after he had been sent to prison for the same crime. He lost parole eligibility because he repeatedly "possessed" firearms when the law prohibited him from doing so.[8] His record established that he had been convicted three times of that crime. In an uncharged possession of a firearm while Defendant was on parole, shortly before the events giving rise to these charges, defendant returned fire with two firearms after what was referred to as a possible car-jacking. The record contains police records relative to that event. The sentence imposed was **agreed upon** by both parties. It was in the mid-range for a second felony offender with a firearm and very low range for a fourth or greater[9] felony offender. This claim has no merit.[93]

[8] Defendant told Agent Everly that his aunt had given him the gun in question for his protection after the drive by shooting shortly before the events giving rise to the subject charges. Defendant's aunt testified that she bought the gun in question because she worked in a bad neighborhood. However, she admitted that she bought it merely 5 days after Defendant had been shot. As a convicted felon, Defendant could not have made such a purchase himself.

[9] Given the predicate convictions in the original Bill of information, as amended and the Habitual Offender Bill, defendant fell well into the "or greater" category.

[93] R. Doc. 16-6 at 1149–52, Order and Reasons, 6/27/23.

The Louisiana First Circuit Court of Appeal denied St. Cyre's related writ application without assigning reasons.[94] The Louisiana Supreme Court denied relief, finding that petitioner failed to show lower court error and failed to satisfy his post-conviction burden of proof under La. Code Crim P. art 930.2.[95]

Initially, St. Cyre has presented no evidence as to what investigative steps his trial counsel actually took or failed to take prior to and during plea negotiations. As the trial court noted, "the record does not reflect _all_ of the conversations that obviously occurred between the State and Tonry" before the habitual offender sentencing.[96] Without such evidence, he cannot show that counsel performed deficiently. _Netter v. Cain_, Civ. Action No. 15-584, 2016 WL 7157028, at *11 (E.D. La. Oct. 6, 2016), _adopted_, 2016 WL 7116070 (E.D. La. Dec. 7, 2016). Furthermore, even assuming that the state was unaware of the mitigation evidence St. Cyre now presents, given St. Cyre's lengthy criminal history, he has not demonstrated a reasonable probability that the state would have agreed to a lower sentence than the one it offered.

Additionally, St. Cyre fails to show prejudice resulting from his counsel's failure to present mitigating evidence at the multiple bill sentencing. St. Cyre pleaded guilty to being a second felony offender pursuant to a plea agreement with

---

[94] _St. Cyre_, 2023 WL 8016458, at *1; R. Doc. 16-8 at 56.
[95] _St. Cyre_, 384 So. 3d at 342; R. Doc. 16-6 at 1–2.
[96] R. Doc. 16-6 at 1150, Order and Reasons, 6/26/23.

an agreed-upon sentence of thirty years.[97] The plea agreement negotiated by defense counsel was very favorable to St. Cyre, who faced a life sentence as a quadruple multiple offender and a maximum of forty years as a second felony offender. St. Cyre was adjudicated accordingly and sentenced to the agreed upon sentence of thirty years at hard labor. "An attorney cannot be ineffective for failing to present mitigating evidence at a sentencing hearing that was never held." *Young v. Ones*, Civ. Action No. 08-0888, 2010 WL 5373926, at * (E.D. La. Dec. 9, 2008) (citation omitted) (holding that counsel was not ineffective in allowing trial court to sentence petitioner without considering mitigating factors where petitioner was sentenced in accordance with plea agreement), *adopted*, 2010 WL 5376369 (E.D. La. Dec. 21, 2010).

Nor has St. Cyre showed that his counsel was ineffective in failing to move to reconsider the sentence or any resulting prejudice. Initially, St. Cyre is incorrect in contending that he was unable to appeal his sentence because of counsel's failure to file a motion for reconsideration. That bar resulted from the fact that the thirty-year sentence was imposed in conformity to the terms of the plea agreement and not from the absence of any such motion by counsel. *See* La. Code. Crim. P. art. 881.2(A)(2)

---

[97] *See* R. Doc. 16-6 at 1141, Order and Reasons, 6/27/23 ("After some time and negotiations amongst the parties, Defendant and the State entered into an agreement by which the State would reduce it's [sic] habitual offender allegations to which Defendant would admit, and accept a sentence of thirty years[.]") ; R. Doc. 16-4 at 42, Appeal Brief, 2019 KA 0034, 6/3/19 (conceding that "St. Cyre admitted to the allegations in the Multiple Offender Bill of Information pursuant to a plea agreement); *St. Cyre*, 292 So. 3d at 34–35 ("As a second-felony habitual offender with an agreed-upon sentence, the trial court sentenced the defendant to thirty years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.").

("The defendant cannot appeal or seek review of a sentence imposed in conformity with a plea agreement which was set forth in the record at the time of the plea."); *State v. Johnson*, 768 So. 2d 234, 236–37 (La. App. 1st Cir. 2000) ("Louisiana Code of Criminal Procedure article 881.1 D provides that the failure to file or make a motion to reconsider sentence precludes the defendant from raising an excessive sentence argument on appeal. Herein, however, defendant was barred from seeking review of his sentence because it was imposed as part of a plea agreement, not from counsel's failure to make a motion to reconsider sentence. Thus, there was no deficient performance by defense counsel."); *see also State v. Doming*, 197 So. 3d 812, 817 (La. App. 5th Cir. 2016) ("A defendant cannot appeal or seek review of a sentence imposed in conformity with a plea agreement that was set forth in the record at the time of the plea. La. C. Cr. P. art. 881.2 A(2). Therefore, trial counsel's failure to move for reconsideration of the sentence does not constitute deficient performance.").

Further, St. Cyre has not shown that there is as reasonable probability that, but for counsel's alleged errors, he would not have pleaded guilty to being a habitual offender and would have insisted on a hearing. *Joseph*, 838 F.2d at 791 (holding with respect to a claim of ineffective assistance involving an habitual offender plea that "it is [the petitioner's] burden to demonstrate a reasonable probability that, but for counsel's errors, he would not have admitted his prior convictions and would have demanded a trial on the multiple offender charge."). St. Cyre does not even allege that he would not have pleaded guilty to being a second felony offender and would have insisted that the state prove that he was a fourth felony offender as originally

charged. Moreover, any such allegation would not be credible given that the plea agreement benefitted St. Cyre greatly. As noted, as a fourth felony offender, he faced a maximum sentence of life imprisonment. Even as a second felony offender, St. Cyre faced a potential sentence of forty years, ten years longer than the agreed upon sentence. The Court finds that there is no reasonable probability that St. Cyre would have declined the favorable plea bargain. Nor is there any reason to believe that the state could not easily prove that St. Cyre was a fourth felony offender.

In summary, to be entitled to relief, St. Cyre must demonstrate that the state court decision rejecting his ineffective assistance of counsel claim was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. He has not made that showing in the instant case. Accordingly, utilizing AEDPA's doubly deferential standards of review applicable to such claims, this Court should deny relief.

### 3.   Appellate Counsel (Claim 4 in Part)

St. Cyre argues that his appellate counsel was ineffective for failing to raise on appeal that his habitual offender hearing was legally defective. St. Cyre argues that appellate counsel admitted in an affidavit that he failed to research the issue.[98] The state responds that St. Cyre was advised of his rights and, therefore, appellate counsel was not ineffective in failing to raise the issue.

---

[98] *See* R. Doc. 16-6 at 881–82, Affidavit of Attorney Samuel H. Winston, 3/7/23.

The trial court in denying the claim on post-conviction relief, explained:

**In Claim IV**, Defendant argues that appellate counsel, Winston, was ineffective in failing to raise on appeal the issue raised in Claim III. Post Conviction counsel states "This failure was due to counsel's admitted error that he failed to research the issue." In Winston's affidavit (Exhibit D to the Supplement) he admits that he did no such research.[4] However, such research was unnecessary since a simple review of the record revealed that defendant was informed of his rights. This Claim has no merit.[99]

> [4] It appears that Posner determined, at least in part, the provisions of Winston's affidavit.

The Louisiana First Circuit Court of Appeal denied St. Cyre's related writ application without assigning reasons.[100] The Louisiana Supreme Court denied relief, finding that petitioner failed to show lower court error and failed to satisfy his post-conviction burden of proof under La. Code Crim P. art 930.2.[101]

Criminal defendants are entitled to effective assistance of counsel in their first appeal of right. *Evitts v. Lucey*, 469 U.S. 387, 394 (1985). The *Strickland* standard for judging performance of counsel also applies to claims of ineffective appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997). To prevail on a claim that appellate counsel was constitutionally ineffective, a petitioner must show that his appellate counsel unreasonably failed to discover and assert a nonfrivolous issue and must establish a reasonable probability that he would have prevailed on this issue on appeal but for his counsel's deficient

---

[99] R. Doc. 16-6 at 1142-43, Order and Reasons, 6/27/23.
[100] *St. Cyre*, 2023 WL 8016458, at *1; R. Doc. 16-8 at 56.
[101] *St. Cyre*, 384 So. 3d at 342; R. Doc. 16-6 at 1-2.

representation. *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001); *Smith*, 528 U.S. at 285–86.

However, effective appellate counsel is not required to assert every nonfrivolous available ground for appeal. *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998) (citing *Evitts*, 469 U.S. at 394). On the contrary, the United States Supreme Court has long recognized that appellate counsel filing a merits brief need not and should not argue every nonfrivolous claim; instead, appellate counsel may legitimately select from among them in the exercise of professional judgment to maximize the likelihood of success on appeal. *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983). Appellate counsel has the discretion to exclude even a nonfrivolous issue if that issue was unlikely to prevail. *See Anderson v. Quarterman*, 204 F. App'x 402, 410 (5th Cir. 2006) ("The issues that Anderson argues his counsel should have raised on direct appeal . . . lack merit. As such, failure to raise these issues did not prejudice Anderson."); *Penson v. Ohio*, 488 U.S. 75, 83–84 (1988) (noting that courts have refused to find counsel ineffective when the proposed appellate issues are meritless); *Kossie v. Thaler*, 423 F. App'x 434, 437 (5th Cir. 2011) (recognizing the Supreme Court's basic rule that the presumption that appellate counsel was effective can be overcome only when the claims not asserted are stronger than those that were in fact raised).

Thus, because one of appellate counsel's important duties is to focus on those arguments that are most likely to succeed, counsel will not be found constitutionally ineffective for failure to assert every conceivable issue. *Smith*, 528 U.S. at 288; *Jones*,

463 U.S. at 754. Rather, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones*, 463 U.S. at 751–52. Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits the client because "a brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions." *Id.* at 753. As a result, the test to be applied in assessing such a claim is whether the issue ignored by appellate counsel was "clearly stronger" than the issues actually presented on appeal. *See, e.g.*, *Diaz v. Quarterman*, 228 F. App'x 417, 427 (5th Cir. 2007); *accord Smith*, 528 U.S. at 288.

St. Cyre has not met this burden. On appeal, appellate counsel argued: (1) the the trial court erred in denying his motion to suppress the evidence; (2) the trial court erred in denying his motion to suppress his statement to Agent Everly; (3) the trial court erred in permitting the state to present prejudicial evidence without probative value after previously ruling the evidence was inadmissible; (4) the trial court erred in overruling his objection to the prosecutor's closing argument; (5) the evidence was insufficient to support his conviction for possession of a firearm by a convicted felon; (6) the trial court erred in imposing a sentence without the benefit of parole; and (7) his conviction should be reversed because he was denied his constitutional right to a complete record of the proceedings. Granted, those challenges were not successful. Nevertheless, this Court simply cannot say that an argument challenging the habitual offender hearing would have been clearly stronger.

There is no express requirement under Louisiana law that the court must inform the defendant of his rights at each phase of the habitual offender proceeding. *State v. Gonsoulin*, 886 So. 2d 499, 501–02 (La. App. 1st Cir. 2004). Rather, "[t]he law requires that the record demonstrate that *the proceedings as a whole* were fundamentally fair and accorded the defendant due process of law." *Id.* at 502 (emphasis original; citation omitted). Louisiana courts have repeatedly rejected the claim that a trial court erred in failing to advise a defendant of his rights a second time before accepting an agreement to the allegations in the multiple bill where the defendant was sufficiently advised of his rights at the arraignment on the habitual offender bill of information. *Id.* ("It would be unnecessarily redundant to advise him again of his right to remain silent at the second hearing, particularly because the only reason he was there was because he had exercised his right to remain silent, after being advised he had this right."); *State v. Gonzales*, No. 2016 KA 0019, 2016 WL 3131780, at *8–9 (La. App. 1st Cir. June 3, 2016); *State v. Douresseaux*, No. 2011 KA 1423, 2012 WL 440462, at *2 (La. App. 1st Cir. Feb. 13, 2012); *State v. Batiste*, No. 2010 KA 0553, 2010 WL 4273176, at *5 (La. App. 1st Cir. 2010).

As explained above in section V.(C), the trial court advised St. Cyre of his rights at the arraignment on the habitual offender bill on August 1, 2018.[102] St. Cyre was represented by counsel and evidently understood his rights as he denied the allegations in the multiple bill.[103] That prompted the setting of a hearing on the

---

[102] R. Doc. 16-3 at 263–65, Hearing Transcript, 8/1/18.
[103] *Id.* at 265.

habitual offender allegations.[104] At the hearing on September 21, 2018, St. Cyre, in the presence of defense counsel, stated on the record that he wanted to admit to being a second felony offender.[105] This Court therefore cannot say that there is a reasonable probability that St. Cyre would have prevailed on appeal if only this claim had been raised.

Accordingly, under the "doubly deferential" standards of review mandated by AEDPA, it is evident that St. Cyre has not shown that the state court's decision rejecting his ineffective assistance of appellate counsel claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As a result, this Court should defer to that ruling and likewise deny the claim.

### E. Cumulative Error (Claim 6)

In his final claim, St. Cyre asserts that he is entitled to relief based on the cumulative effect of the errors in his case. The state responds that, as St. Cyre fails to identify any errors, he is not entitled to relief as to this issue. St. Cyre replies that he has identified constitutional errors.

On post-conviction review, the trial court rejected this claim as St. Cyre's other claims had no merit.[106] The Louisiana First Circuit Court of Appeal denied St. Cyre's related writ application.[107] The Louisiana Supreme Court denied relief, finding that

---

[104] *Id.*

[105] R. Doc. 16-3 at 270, Multiple Offender Hearing and Sentencing Transcript, 9/21/18.

[106] R. Doc. 16-6 at 1152, Order and Reasons, 6/27/23.

[107] *St. Cyre*, 2023 WL 8016458, at *1; R. Doc. 16-8 at 56.

St. Cyre failed to show lower court error and failed to satisfy his post-conviction burden of proof under La. Code Crim P. art 930.2.[108]

For the reasons already explained in detail *supra*, St. Cyre has failed to establish that any errors of constitutional dimension were committed in his case. When no such errors have been established, there is nothing to cumulate and so the cumulative error doctrine simply has no applicability. *Murphy v. Davis*, 901 F.3d 578, 599 (5th Cir. 2018); *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007) ("[A]s this court has stated explicitly, where individual allegations of error are not of constitutional stature or are not errors, there is nothing to cumulate." (quotation marks omitted)); *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) ("Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised."); *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero.").

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that Ronald St Cyre's application be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party

---

[108] *St. Cyre*, 384 So. 3d at 342; R. Doc. 16-6 at 1–2.

has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this 15th day of January, 2025.

_____
**EVA J. DOSSIER**
**UNITED STATES MAGISTRATE JUDGE**